**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

LOUDOUN COUNTY            )
SCHOOL BOARD,          )
                           )
Plaintiff,                   )
                           )
      v.                  )     Case No. 1:23-cv-320
                           )
HEIDI BUNKUA AND THEERAYUT  )
BUNKUA, As Parent and Next Friend  )
Of K.B.,                   )
                           )
Defendant.               )

## **COMPLAINT**

NOW COMES, the Loudoun County School Board ("School Board" or "LCPS"), by and through its attorneys Sands Anderson PC, and for its Complaint states as follows:

## **INTRODUCTION**

1.     This action is brought pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et seq., and its federal and state implementing regulations, 34 C.F.R. Part 300; 8 VAC 20-81-10 et seq., (collectively the "IDEA"), to appeal the December 9, 2022 decision ("Decision") of the administrative Hearing Officer in the case of K.B. (or "Student") and his parents Heidi Bunkua and Theerayut Bunkua ("Parents").

2.     The Hearing Officer's Decision adjudicated a due process hearing request filed by Parents on August 22, 2022.  In their request, Parents challenged the appropriateness of the School Board's proposed public day school placement for Student and requested reimbursement for Student's unilateral private day school placement.  Parents withdrew Student from Loudoun County Public Schools ("LCPS") in August of 2021 and unilaterally enrolled him at the

Katherine Thomas School ("KTS"), which identifies itself as a private school exclusively for students with disabilities, located in Rockville, Maryland, approximately 40 miles from Student's home.

3.      The Hearing Officer's factual findings were not regularly made and his fact-finding process was far from the accepted norm because he failed to give deference to the opinions of the School Board's experts, as required by law, who testified that: (a) the School Board's proposed IEPs were appropriate; (b) the public day school setting is Student's least restrictive environment; and, (c) a private school placement was not required for K.B.  As a result, the Hearing Officer failed to otherwise find that Parents did not meet their burden of proof through expert testimony.

4.      The Hearing Officer's factual findings were not regularly made and his fact-finding process was far from the accepted norm because he allowed expert testimony regarding the appropriateness of School Board's proposed educational program from witnesses who are not experts in the field of special education and whose opinions lacked an improper basis and foundation.   As a result, the Hearing Officer failed to otherwise find that Parents did not meet their burden of proof through expert testimony.

5.      The Hearing Officer's factual findings were not regularly made and his fact-finding process was far from the accepted norm because he failed to determine each issue on the merits based on the factual record.  The Hearing Officer identified fourteen issues for decision in the Hearing, but he failed to determine the majority of those issues.  Instead, the Hearing Officer repeatedly utilized a single paragraph of conclusory findings and incomprehensible justifications. This rubber-stamped, purported rationale failed to address, discuss, or resolve the majority of the

issues in dispute.  Nonetheless, it was copied and pasted throughout the Decision as the dispositive reasoning for resolution of most of the issues.

6.      The Hearing Officer's factual findings were not regularly made and his fact-finding process was far from the accepted norm because many of his factual findings were not supported by the evidence, or contrary to the evidence, as described in Paragraphs 66 to 91 below.

7.      The Hearing Officer's factual findings were not regularly made and his fact-finding process was far from the accepted norm because the Decision erroneously omitted dispositive evidence favorable to the School Board as described in Paragraphs 66 to 91 below.

8.      The Hearing Officer's factual findings were not regularly made and his fact-finding process was far from the accepted norm because the Decision fails to articulate clear or understandable relief granted to the prevailing party.

9.      The Hearing Officer made a substantive error in controlling law and/or failed to apply the correct legal standard when he concluded that Parents provided proper notice of their intent to enroll Student at a private school at public expense.  Parents did not notify the School Board of its intent to enroll Student at a private school at public expense until August 16, 2022, after Parents had signed an enrollment contract for Student's private school and after Student's last IEP team meeting.  Parents actions failed to comply with 20 U.S.C. § 1412(a)(10)(C)(iii)(I).

10.     The Hearing Officer made a substantive error in controlling law and/or failed to apply the correct legal standard because he did not independently evaluate the appropriateness of each IEP proposed by the School Board during the time period at issue in the hearing.

11.     The Hearing Officer made a substantive error in controlling law and/or failed to apply the correct legal standard by incorrectly attributing the burden of proof on several issues to the School Board rather than Parents.

12.     In the Decision the Hearing Officer made a substantive error in controlling law and/or failed to apply the correct legal standard as established under *School Committee of Burlington v. Department of Education*, 471 U.S. 359, 105 S. Ct. 1996, 85 L.Ed.2d 385 (1985). The Hearing Officer failed to conduct a *Burlington* analysis.  As a result, the Hearing Officer failed to otherwise find that Parents did not meet their burden on this issue.

13.     Contrary to the law and evidence, the Hearing Officer concluded that Student was denied a free appropriate public education ("FAPE") and affirmed the Defendants' unilateral placement of Student in an out-of-state private day school.

## PARTIES

14.     The Loudoun County School Board ("School Board") is a political subdivision of the Commonwealth of Virginia existing pursuant to the Constitution and statutes of Virginia. The School Board is vested with the authority to supervise the public schools within Loudoun County. Va. Const., Art. VIII, § 7; Va. Code § 22.1-71; see generally Title 22.1 of the Code of Virginia.

15.     The School Board office is located at 21000 Education Court, Ashburn, Virginia 20148 in the County of Loudoun.

16.     Defendant K.B. ("Student") is a minor child born on August 1, 2012.  Student has been identified as a student with disabilities under the Individuals with Disabilities Education Act of 2004 ("IDEA") as a student with Autism, a Speech or Language Impairment, and an

Other Health Impairment.  Student resides in Loudoun County, Virginia, and was a student attending LCPS until August 16, 2021.

17.     Defendants Mr. Bunkua and Mrs. Bunkua ("Parents") are natural persons who also reside in Loudoun County, Virginia, and are, respectively, Student's father and mother.

## JURISDICTION AND VENUE

18.     This Court has original jurisdiction pursuant to the provisions of 20 U.S.C. § 1415(i)(2) and 28 U.S.C. § 1331, in that the School Board is a "party aggrieved" by the final decision of a State Educational Agency pursuant to 20 U.S.C. § 1415(i)(2)(a).

19.     Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391(b)(1), since the Defendants reside within the judicial district encompassed by this Court.

## STATEMENT OF FACTS

20.     Student is currently ten years old and at all times relevant to this action has been eligible to receive special education and related services as a student with a disability under the IDEA.  During Student's most recent reevaluation in May of 2021, Student was specifically identified as a student with Autism, Speech or Language Impairment, and Other Health Impairment due to diagnoses of ADHD-Combined Type and Sensory Processing Disorder.

21.     Student attended Loudoun County Public Schools ("LCPS") during the 2017-2018 school year as a kindergarten student; the 2018-2019 school year as a first grade student; and the 2019-2020 school year as a second grade student. At Parents' election, as a third grade student during the 2020-2021 school year, Student participated in virtual programming through LCPS.

22.     During the 2017-2018, 2018-2019, and the 2019-2020 school years (up until March of 2020 when the Governor of Virginia issued an Executive Order closing public schools across the Commonwealth of Virginia due to the COVID-19 health emergency), Student received his educational programming primarily in the K-2 Autism Program located at Little River Elementary School.

23.     The K-2 Autism Program consisted of eight students, one teacher, and two teaching assistants. Other School Division personnel would also spend time in this classroom working with the students, including an Occupational Therapist, a Speech Language Therapist, and paraprofessionals from other classrooms.  In the K-2 Autism Program, Student often participated in small-group work, typically consisting of two to three students at a table with an adult.  The methodology used in the classroom was based upon the principals of ABA including discreet trial training, progress monitoring, direct instruction, and prompts and prompt fading.

24.     In order to practice and generalize his skills across settings, Student also received opportunities at Little River Elementary School to participate in the general education setting with his non-disabled peers.  Student received a portion of his math and language arts instruction in a general education classroom and participated with his non-disabled peers in gym, electives, lunch, and recess.  During his time in the general education setting, special education personnel supported Student with practicing his communication and social skills with non-disabled peers.

25.     Student made both behavioral and academic progress in the K-2 Autism Program. For example, his January 2020 IEP progress report (the last progress report issued prior to the onset of distance learning), reflected that he had mastered several of his IEP goals and had come close to mastering the remainder of his goals.

26.     In March 2020, the Governor of Virginia issued an Executive Order closing public schools across the Commonwealth of Virginia for the remainder of the 2019-2020 school year due to the COVID-19 health emergency.

27.     In the spring of 2020, during the period in which LCPS was closed pursuant to the Governor's Executive Order, Student's family moved to a new residence in Loudoun County. The family's new residence, and where the family currently resides, is located within the attendance zone for Goshen Post Elementary School.  The family's residence is located approximately 0.9 miles from Goshen Post Elementary School.  As a result, Student's assigned school within LCPS transitioned from Little River Elementary School to Goshen Post Elementary School.

28.     During the summer of 2020, School Board offered to provide Student with in-person extended school year services.  Parents elected for Student to receive his extended school year services virtually.

29.     Although Student has been eligible to attend Goshen Post Elementary School since moving to the Goshen Post Elementary School attendance zone prior to the 2020-2021 school year, Student has never physically attended Goshen Post Elementary School to receive instruction or services.  Immediately prior to the start of the 2020-2021 school year, Parents informed LCPS that they were declining the in-person educational program available at Goshen Post Elementary School.  Instead, Parents elected to keep Student at home and to have Student participate in his educational programming virtually.  Parents elected to have Student participate in virtual instruction at three separate points during the 2020-2021 school year, despite receiving the option to have Student receive his instruction in-person at Goshen Post Elementary School.

After the 2020-2021 school year, Parents withdrew Student from LCPS and unilaterally enrolled him at a private school.  Student has not returned to LCPS.

30.     From August 2020 through June 2021 (the period of time in which Student participated in virtual instruction), Student's eligibility and IEP teams convened over ten times to review and update Student's educational program to ensure it continued to enable Student to make progress and to accommodate Parent's selection of virtual instruction.

31.     The IEP team's discussions were informed not only by staff and parent input, but also by information obtained from evaluations completed both by LCPS and private providers selected by the family in the fall of 2020 and winter of 2021.  The private evaluations specifically reviewed by the IEP team during this period included a neuropsychological evaluation completed by Dr. William Ling, Ph.D. and an occupational therapy evaluation completed by Ms. Gretchen Ward, MS, OTR/L.  During these meetings, Student's IEP team had extensive and comprehensive conversations regarding each component of the IEP and the team agreed to make numerous updates to the IEP document to reflect the concerns and input of Parents.

32.     The primary request of the family to which the LCPS members of the IEP team could not agree was for Student to have a school staff member come to Student's home each school day to work with him one-on-one while he participated in his virtual instruction.

33.     The school-based members of Student's IEP team rejected Parents' request, in part, because they determined that Student's individualized needs could be met through the in-person programming available at Goshen Post Elementary School.  At Goshen Post Elementary School, Student would have the support of multiple teachers, paraprofessionals, and related service providers while participating in his educational programming and he would benefit from

8

the opportunity to interact with his non-disabled peers.  Parents would not agree to LCPS' proposal.

34.     Parents reported to LCPS that they did not want Student to attend Goshen Post Elementary School in-person because they believed Student would be unable to wear a face mask during the instructional day.  Parents reported that they were concerned that if Student could not wear a face mask, he would be subjected to discipline by School Board personnel and would have an increased risk of contracting COVID-19 from someone in the school setting. Parents never submitted documentation from a licensed medical professional to support a claim that Student had an underlying health condition placing him in a high-risk group related to COVID-19.

35.     The proposed in-person program for Student at Goshen Post Elementary School incorporated supports for students who demonstrated difficulty wearing a face mask as a result of their disability.  Students in the proposed program were not disciplined for being unable to wear a face mask.  Instead, School Board personnel worked with the students on mask tolerance through social stories, special visuals, and modeling.  While students built their tolerance for mask wearing within the school building, additional strategies were employed to mitigate the transmission of COVID-19, to include social distancing and placing plexiglass shields around individual student desks.  Despite these options, Parents would not agree to allow Student to attend Goshen Post Elementary School for in-person instruction.

36.     During the 2020-2021 school year, Parents conceded during the Hearing that they travelled out-of-state on at least one occasion with Student and that Student successfully wore a face mask during the trip.  Specifically, in the fall of 2020, Student missed virtual instruction with LCPS in order to travel with his family to Disney World in Orlando, Florida.  Student and

Parents flew on an airplane from Virginia to Florida for the trip.  Student and Parents were required to wear a face mask while in airports and on airplanes.  Parents report that, with prompting and support, Student successfully wore both a face mask and face shield while flying. Student and Parents were also required to wear a face mask while at Disney World and other public attractions.  Parents report that Student also successfully wore a face mask while attending Disney World and other attractions.

37.    The school-based members of Student's IEP team also rejected Parents' request for a School Board employee to provide Student with one-on-one instruction in his home because the school staff proposed alternative solutions that could address Student's needs while he received his instruction virtually. These solutions included, but were not limited to: (1) providing Student with a second computer monitor so that a special education staff member could be on a separate google link to help provide individualized prompting and support to Student while he participated in group instruction; (2) offering to have staff remotely control Student's computer to help Student navigate virtual class meeting links and access electronic class materials; (3) offering to provide Student with a laptop with touch-screen capabilities to address concerns regarding the use of a computer mouse/track pad; (4) offering to connect Student with the school counselor/social worker to address the concerns of the family regarding Student's mental health; (5) offering to include Student in virtual "lunch bunch" sessions where Student could socialize with his peers; and (6) offering to collaborate with Student's private ABA therapist regarding strategies to further support Student during virtual learning. Parents refused to try any of the solutions offered by LCPS.

38.    Although School Board personnel attempted to craft creative and individualized solutions to support Student during his participation in virtual learning, Student did not regularly

10

attend and participate in virtual instruction, including his special education and related services, during the 2020-2021 school year.

39.    As documented on pages 7-8 of Student's proposed June 15, 2021 IEP, during the 2020-2021 school year:

> "[Student] has missed about 22% of Reading Mastery instruction and did not attend the full session about 5% of sessions. [Student] has missed about 24% of small group instruction and did not attend full sessions in about 4% of sessions attended. [Student] has missed about 26% of IEP goal work/gen ed. review sessions and did not attend full sessions about 8% of sessions attended. [Student] has missed about 36% of general education Content/LA session and did not attend full session in about 13% of sessions attended. [Student] has missed about 43% of general education math sessions and did not attend [full] sessions in about 25% of sessions attended."

40.    During an IEP team meeting on June 15, 2021, Parents, for the first time, requested that the IEP team change Student's educational placement to a private day school. After considering the input of Parents, school staff, and documentation of Student's educational progress, the IEP team considered, but rejected, Parents' request because the school-based members of the IEP team did not agree that a private day school was Student's least restrictive environment.  Prior to the COVID-19 school closures in March 2020, Student had made appropriate progress when he attended the public day school in person and benefitted from the opportunity to generalize his skills alongside his non-disabled peers.  Since March 2020, at Parents' choice, Student had only participated in instruction virtually and had extremely inconsistent school attendance while participating in that virtual instruction.

41.    The school-based members of the IEP team continued to recommend that Student return to Goshen Post Elementary School for in-person instruction.  The June 15, 2021 IEP proposed placing Student in a Grade 3-5 self-contained autism classroom at Goshen Post Elementary School. The methodology used in the self-contained autism classroom included

11

evidence-based teaching practices based on the principals of ABA. The June 15, 2021 IEP included goals, services, and accommodations that addressed all of Student's deficits, including his needs in the areas of receptive and expressive language, auditory processing, and articulation. At the conclusion of the meeting, Parents agreed to take time to consider the IEP team's proposal.

42.     On August 11, 2021, Parents signed an enrollment contract with the Katherine Thomas School ("KTS") a private school exclusively for students with disabilities located in Rockville, Maryland approximately forty miles from Parents' residence.

43.     On August 16, 2021, Parents notified the School Board for the first time of their intent to withdraw Student from LCPS and to unilaterally place Student at KTS.

44.     Student attended KTS during the 2021-2022 school year as a fourth-grade student and has continued at KTS for the 2022-2023 school year as a fifth-grade student.

45.     From August 2021 through August 2022 (when Parents initiated the underlying due process hearing at issue in this appeal), Student's IEP team convened four times.  During these IEP team meetings, the IEP team discussed and considered Parents' input regarding the proposed June 15, 2021 IEP; input and information provided by staff members from Student's private school, KTS; input and information from School Board personnel, to include information obtained by School Board personnel during multiple observations of Student at KTS; and the recommendations of an additional private evaluation Parents provided to the School Board.

46.     The private evaluation Parents provided to the School Board was a July 2021 report completed by Dr. Jay R. Lucker.  Although Dr. Lucker's report was completed in July of 2021, Parents did not provide the School Board with a copy of Dr. Lucker's report until February of 2022.  In March of 2022, Student's IEP team convened to consider the results of Dr. Lucker's

report.  Dr. Lucker attended the IEP team meeting and provided additional input for the IEP team's consideration.  Based on the IEP team's discussion, the IEP team agreed to update Student's proposed IEP to incorporate the recommendations from Dr. Lucker's report.

47.     Based upon the IEP team's deliberations and review of updated information regarding Student during the four IEP team meetings held between August 2021 and August 2022, the IEP team developed and proposed two new IEPs for Student, dated April 1, 2022 and August 18, 2022, respectively.  Both IEPs proposed that Student's individualized needs could be met within the public day school setting.

48.     The public day school programming proposed by the School Board in both the April 2022 and August 2022 IEPs has many similarities to the programming available to Student at KTS.  Student's classroom within LCPS would have a maximum of eight students to two teaching assistants and one teacher, whereas KTS has a maximum of seven students to two teaching assistants and one teacher.  The length of the school day in both programs is six to six-and-a half hours.  Both LCPS' and KTS' programs have related service personnel available to support classroom instruction, as well as the ability for pullout services. Both LCPS' and KTS' programs have support from a Board Certified Behavior Analyst.  LCPS' proposed IEPs include goals that are similar, or even identical, to the goals being addressed by KTS.  While KTS' proposed programming includes 60 minutes per week of speech-language therapy, LCPS' most recently proposed IEP includes 90 minutes per week of speech-language therapy.

49.     In contrast to the programming available at KTS, the programming outlined within the proposed April 2022 and August 2022 IEPs would provide Student with the opportunity to participate and interact with his non-disabled peers in a general education setting. Additionally, the proposed public day school program is available less than a mile from

13

Student's home, in comparison to KTS, which is approximately forty miles from Student's home.

50.     Parents declined to provide consent for the School Board to implement either the April 2022 or August 2022 proposed IEPs.

## THE DUE PROCESS HEARING

51.     Parents, through Counsel, initiated the Due Process proceeding that is the subject of this appeal on August 22, 2022.  The Administrative Complaint was assigned to Hearing Officer Robert Hartsoe, Esq. for adjudication.

52.     The Hearing Officer issued a Pre-Hearing Report on October 4, 2021 identifying fourteen issues to be determined during the due process hearing.  Those issues were: "(1) Whether the LEA failed to identify the Child's Special Education Needs in accordance with IDEA for school year 2020-2021; (2) Whether the LEA failed to identify the Child's Special Education Needs in accordance with IDEA for school year 2021-2022; (3) Whether the LEA failed to identify the Child's Special Education Needs in accordance with IDEA for school year 2022-2023; (4) Whether the LEA provided a free appropriate public education ("FAPE") during school year 2020-2021; (5) Whether the LEA provided FAPE during school year 2021-2022; (6) Whether the LEA provided FAPE during school year 2022-2023; (7) Whether the LEA provided the Child with an appropriate placement in accordance with IDEA for school year 2020-2021; (8) Whether the LEA provided the Child with an appropriate placement in accordance with IDEA for school year 2021-2022; (9) Whether the LEA provided the Child with an appropriate placement in accordance with IDEA for school year 2022-2023; (10) For the 2021-2022 school year, whether the Parent Child should be reimbursed for costs arising from private placement;

14

(11) Whether the Parent/Child should be reimbursed for costs for private evaluations described in the Due Process Request; (12) Whether the issues raised by the Due Process Request are barred, in whole or in part, by the statute of limitations; (13) Whether the IEP team, assembled for the IEP meeting conducted on June 6, 20221, was consistent with the IDEA, and, if not, was the child denied FAPE as a result; and (14) Whether the IEP team, assembled for the IEP meeting conducted on August 18, 2022 was consistent with the IDEA and, if not, was the Child denied FAPE as a result."

53.    An administrative Due Process Hearing was held over the course of four days beginning on October 11, 2022 through October 14, 2022.

54.    Parents should have been required to bear the burden of proof in the Due Process Hearing.

55.    Parents should have been required to offer expert testimony in support of their position.

56.    During the presentation of their case, both Parents testified and they also presented testimony from six additional witnesses.  None of the witnesses were licensed to teach special education in Virginia.  None of Parents' witnesses, with the exception of the Father, had ever observed LCPS' proposed program at Goshen Post Elementary School.

57.    To support their assertion that the IEPs proposed by the School Board were not appropriate, Parents presented testimony from three witnesses: Dr. Ling, a clinical psychologist; Dr. Lucker, a speech-language pathologist and audiologist; and Ms. Csutoros, a BCBA who provided private ABA therapy services to Student in his home.  None of these witnesses have ever been licensed to teach, either general or special education, in the Commonwealth of Virginia.  Although Dr. Lucker testified that he was licensed as a special education teacher in the

15

state of New York in the 1990's, he is no longer employed as a special education teacher and was not qualified by the Hearing Officer as an expert in the areas of special education or designing educational programs for students with disabilities.  Neither Dr. Ling nor Ms. Csutoros have ever worked as a teacher or been employed by a public-school system and were also not qualified by the Hearing Officer in the areas of special education or designing educational programs for students with disabilities.

58.     Neither Dr. Ling nor Dr. Lucker has ever provided direct services or instruction to Student.

59.     None of these three expert witnesses ever observed the School Board's proposed program for Student.

60.     Dr. Ling and Ms. Csutoros did not attend any of Student's IEP team meetings held between June 2021 and August 2022.  Dr. Lucker attended one IEP meeting held on March 28, 2022, but he did not attend the entirety of the meeting. Dr. Lucker did not identify any deficits in the IEP during the sole IEP meeting he partially attended.

61.     In contrast, during the presentation of its case, the School Board presented testimony from three School Board employees, all of whom were qualified as expert witnesses in the area of special education: Dr. Engstrom, a special education supervisor responsible for overseeing programming across LCPS for students with Autism; Ms. Hill, an autism consulting teacher and a former special education teacher of Student; and Ms. Davis, a speech-language pathologist and supervisor for related services across LCPS.

62.     All three expert witnesses unanimously testified that Student's individualized needs could be addressed within the less restrictive setting of a public day school.  These witnesses also unanimously testified that each of the IEPs proposed by the School Board during

the time period at issue in this case were appropriate and designed to address Student's individualized needs.

63.     All three expert witnesses had direct knowledge of the proposed program within LCPS and all three expert witnesses had observed Student at KTS.

64.     The School Board's experts had direct knowledge of Student and were familiar with Student through: review of his historical education record; attendance at Student's IEP team meetings; consultation with former and current teachers; and observations of Student at KTS. One of the School Board's expert witness, Ms. Katharine Hill, also served as Student's teacher and case manager for two school years prior to Student's withdrawal from LCPS.  Ms. Hill's testimony included specific examples of Student's progress while he participated in LCPS' programming and how the IEPs proposed by LCPS were appropriate for addressing Student's needs based on her personal knowledge of Student.

65.     The School Board's experts also had substantial training and experience working with children with autism.  Two of the School Board's expert witnesses, Ms. Hill and Dr. Engstrom, are currently licensed as Board Certified Behavior Analysts ("BCBA") in the Commonwealth of Virginia.

## THE DECISION'S ERRORS OF PROCESS, FACT, AND LAW

66.     The evidence and the laws governing the provision of special education services do not support the Hearing Officer's decision.

67.     The Hearing Officer committed error by failing to render a proper decision based on an accurate application of law to the facts.

68.     The Hearing Officer committed error by failing to apply correct legal standards in rendering his Decision.

69.     The Hearing Officer failed to give the deference required under the IDEA to the

expert opinions of the School Board's witnesses, who unanimously testified that the IEPs

proposed by the School Board were appropriate and addressed Student's individualized needs in

the least restrictive environment.  A hearing officer is required to give deference to the opinions

of school board witnesses who are professional educators.

70.     The Hearing Officer's conclusion that the opinions of the School Board's expert

witnesses could not be given any deference because these experts were unable "to observe the

Child, meaningfully and daily, in an educational environment" is unsupported by the record.

One of the School Board's expert witnesses, Ms. Hill, was Student's teacher and special

education case manager for two consecutive school years when Student attended LCPS. While

Ms. Hill has not worked with Student as recently as Student's teachers at KTS, Ms. Hill has had

more exposure and interaction with Student in an educational setting than all of the expert

witness presented by Parents.  Ms. Hill has also continued to remain knowledgeable of Student

and his individualized needs by reviewing his educational records; observing Student during

virtual learning during the 2020-2021 school year; assisting with the development of a functional

behavior assessment ("FBA") for Student during the 2020-2021 school year; attending IEP team

meetings for Student; conducting an observation of Student at KTS during the summer of 2022;

and speaking with staff at KTS regarding Student.  The School Board's other expert witnesses,

Dr. Engstrom and Ms. Davis, have also observed Student at KTS; reviewed his educational

records; attended IEP team meetings; and talked with the staff at KTS.

71.     The Hearing Officer's conclusion that the opinions of the School Board's expert

witnesses could not be given deference due to their inability "to observe the Child, meaningfully

and daily, in an educational environment" is also erroneous because the experts do not have

18

access to Student solely because Parents elected to withdraw Student from the public schools.  If the Hearing Officer's analysis were correct, then School Board personnel would never be able to express opinions about the educational programming of a unilaterally placed private school student.  Parents seeking a private placement at public expense would also be incentivized to withdraw their children from the public schools and then either deprive public personnel access to their children or wait to file a due process hearing to assert that school personnel are unfamiliar with the children.

72.     The Hearing Officer's erroneous conclusion was also not equally applied to Parents' expert witnesses.  None of Parents' three expert witnesses who were called to testify about the School Board's proposed IEPs have daily interaction or observation of Student in an educational setting.  Aside from conducting an evaluation of Student in a clinical setting, neither Dr. Ling nor Dr. Lucker have ever provided instruction or services to Student.  They also did not observe LCPS' proposed educational program.  Parents' private ABA provider, Ms. Csutoros, has provided ABA services to Student in his home, but not on a daily basis.  Ms. Csutoro has also never provided services or instruction to Student in an educational setting and has never observed LCPS' proposed educational program at Goshen Post Elementary School.

73.     The Hearing Officer incorrectly concluded that all IEPs proposed by the School Board did not provide Student with FAPE, without conducting the required individualized analysis of each proposed IEP. The Hearing Officer's failure to individually analyze each of the School Board's proposed IEPs resulted in errors of fact and law.

74.     The Hearing Officer improperly evaluated the appropriateness of IEPs proposed by the School Board utilizing evidence not available to the IEP team at the time the IEP was created.

19

75.     The Hearing Officer incorrectly allowed non-educational experts to give opinions

on issues beyond the scope of their expertise and then incorrectly relied on those opinions to

make his determination.

76.     The Hearing Officer failed to utilize and apply the correct legal standard

articulated in <u>Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.</u>, which

requires that in cases involving a request for tuition reimbursement, a parent must demonstrate

that, "(1) the public school's placement was not providing the child with a free appropriate public

education; and (2) the parents' alternative placement was proper under IDEA."  471 U.S. 359,

369-70 (1985).

77.     The Hearing Officer instead placed the burden on the School Board to

demonstrate that the programming at KTS did not provide FAPE.

78.     The Hearing Officer's legal conclusions are identical for many of the fourteen

issues adjudicated in the Hearing, creating multiple errors of fact and law.

79.     To justify his legal conclusions, the Hearing Officer repeatedly stated

(approximately thirteen times) that the LEA was "focused on issues outside of [Student's] IDEA

requirements as opposed to effectuating his IDEA needs of the [Student], a consequence of the

COVID reality."  The Hearing Officer gives no explanation for what this otherwise amorphous

statement means, and the plain language of this repeated statement is incomprehensible.  The

Hearing Officer's conclusion is further unsupported by any evidence or testimony presented

during the administrative hearing.

80.     To describe his legal conclusions for issues 5, 6, 8, 9, and 10 (each addressing the

appropriateness of the School Board's proposed educational program for either the 2021-2022 or

2022-2023 school years), the Hearing Officer includes the following statement, copied directly

from his analysis of issues 4 and 7 (addressing the appropriateness of the School Board's

educational program for Student during the 2020-2021 school year):

> "In addition and for reasons stated herein, the referenced applicable IEP was found
> deficient under IDEA requirements.  As a result, implementation of such IEP's
> mandates were deficient under IDEA requirements. To complicate matters, the
> effort by the LEA to provide the Child IDEA services virtually violated IDEA
> requirements."

The Hearing Officer's statement is directly contradicted by the evidence and testimony presented

at the Due Process Hearing.  Student did not participate in any virtual services through LCPS

during the 2021-2022 or 2022-2023 school years nor did LCPS offer Student any virtual services

during these school years.  All IEPs developed by the School Board for Student during this

period proposed that Student receive his educational programming in-person at Goshen Post

Elementary School.  Additionally, although educational services were available to Student

through LCPS for both the 2021-2022 and 2022-2023 school years, Parents declined this

programming and instead unilaterally enrolled Student at a private school, KTS.  Student

attended KTS for the entirety of the 2021-2022 school year and has continued at KTS for the

2022-2023 school year.  As a result, the Hearing Officer's conclusion that the School Board

violated the IDEA through its "implementation of such IEP's mandates" is factually erroneous as

the School Board was not afforded the opportunity to implement an IEP for Student during either

the 2021-2022 or 2022-2023 school years.

81.     To describe his legal conclusions for issues 2, 3, 5, 6, 8, 9, and 10 (issues relating

to either the 2021-2022 and 2022-2023 school years), the Hearing Officer stated: "the LEA

appeared to be focused on issues outside of the Child's IDEA requirements as opposed to

effectuating his IDEA needs of the Child, a consequence of the COVID reality."  The Hearing

Officer provides no explanation for the meaning of this statement and while the plain language

of the statement is unclear, the statement is unsupported by any evidence or testimony presented

at the administrative hearing.  To the contrary, during the 2021-2022 and 2022-2023 school

years, schools within LCPS were fully operational, with in-person instruction available to

Student and all students residing in Loudoun County.

82.    The Hearing Officer's conclusion that KTS constitutes Student's least restrictive

environment is unsupported by the evidence and was reached without engaging in the proper

legal analysis required under the IDEA.

83.    The IDEA requires that students with disabilities be mainstreamed, meaning

educated with non-disabled peers, "to the maximum extent appropriate."  20 U.S.C. §

1412(a)(5)(A).  As cited in the Hearing Officer's decision, "mainstreaming of handicapped

children into regular school programs…is not only a laudable goal but is also a requirement of

the Act." DeVries v. Fairfax County Sch. Bd., 882 F.2d 876 (4th Cir.1989).  Mainstreaming is

not appropriate "only when the nature or severity of the disability is such that education in

regular classes with the use of supplementary aids and services cannot be achieved

satisfactorily."  Id. (emphasis added).

84.    The Fourth Circuit has held that mainstreaming is not required only when "(1) the

disabled child would not receive an educational benefit from mainstreaming into a regular class;

(2) any marginal benefit from mainstreaming would be significantly outweighed by benefits

which could feasibly be obtained only in a separate instructional setting; or, (3) the disabled child

is a disruptive force in a regular classroom setting." Hartmann by Hartmann v. Loudoun Cnty.

Bd. of Educ., 118 F.3d 996, 1001 (4th Cir. 1997)(citing DeVries v. Fairfax County Sch. Bd., 882

22

F.2d 876 (4th Cir.1989)).  The Hearing Officer's decision does not cite, acknowledge, or provide any analysis of these factors.

85.    The Hearing Officer's conclusion that "no persuasive evidence was introduced [that] KTS did not provide [Student] the least restrictive environment in accordance with IDEA" constitutes an error of both fact and law.  First, Parents carried the burden of proof in the due process proceeding.  See Schaffer v. Weast, 546 U.S. 49, 62 (2005).  The Hearing Officer therefore incorrectly placed the burden of proof on the School Board to establish that KTS was not Student's least restrictive environment, rather than requiring Parents to demonstrate that the School Board's proposed public school program was not Student's least restrictive environment. The Hearing Officer's conclusion further fails to acknowledge that mainstreaming is the "presumption," that can only be overturned by an affirmative showing that a student's needs cannot be satisfactorily met within the general education setting.  See Hartmann by Hartmann v. Loudoun Cnty. Bd. of Educ., 118 F.3d 996, 1001 (4th Cir. 1997).

86.    The Hearing Officer's decision failed to acknowledge the testimony and evidence presented by the School Board demonstrating that Student's needs could be met within the less restrictive setting of a public school.  The Hearing Officer did not cite or acknowledge the testimony from one of the School Board's expert witnesses who explained, based on her direct knowledge of Student and her professional expertise, that Student would receive educational benefit from being able to participate and practice generalizing his skills with non-disabled peers.

87.    The Hearing Officer's conclusion that Parents must be "reimbursed for expenses for the Neuropsychological Report and Speech/Audio Evaluation" is unsupported by any evidence or testimony presented at the administrative hearing.

88.     Although Parents requested this relief in their original Due Process Hearing Request, Parents presented no evidence, such as invoices or receipts, or testimony at the Hearing that established the costs of these evaluations or established that Parents incurred any expenses to obtain these evaluations that have not already been reimbursed by the School Board.  In their Closing Argument, Parents presented no argument that Parents have any outstanding expenses associated with Dr. Lucker's speech evaluation.  Parents acknowledge in their Closing Argument that the School Board paid for a portion of Dr. Ling's neuropsychological evaluation, consistent with the School Board criteria for Independent Educational Evaluations ("IEEs"), but argued that the School Board should be required to pay additional fees for Dr. Ling's evaluation.  Parents presented no evidence or testimony at the Hearing establishing or describing any outstanding fees associated with Dr. Ling's evaluation or establishing Parents' payment of these alleged fees.

89.     The Hearing Officer moreover erroneously concluded that the School Board denied Parents' request for one-on-one services in Student's home during the 2020-2021 school year because the School Board did not want to "open the flood gates" for similar requests.  This conclusion is unsupported by any evidence or testimony presented at the Hearing.

90.     During the 2020-2021 school year, Parents elected to have Student receive his instruction virtually rather than sending Student to Goshen Post Elementary School for in-person instruction, as recommended School Board personnel.  Student's IEP team considered Parents' request for LCPS to provide a staff member to work with Student one-on-one in his home while Student participated in the virtual instruction requested by Parents.  The IEP team denied Parents' request on basis that one-to-one instruction in Student's home was not necessary for Student to receive FAPE.  Student's IEP team instead proposed alternative solutions to support

24

Student and to accommodate Parents' request for Student to receive his instruction virtually. Parents declined the School Board's proposals.

91.     The Hearing Officer made the erroneous legal conclusion that the appropriateness of KTS establishes that the program proposed by the School Board is not appropriate.

## COUNT I
## FAILURE TO GIVE REQUIRED DEFERENCE TO SCHOOL BOARD'S EXPERTS

92.     Plaintiff realleges and incorporates by reference paragraphs 1 – 91 as if fully set forth herein.

93.   In conducting the administrative Due Process Hearing below, the Hearing Officer had a duty to ensure that his factual findings were regularly made and his fact-finding process followed the accepted norm of giving due deference to the opinions of the School Board's experts.  See Hartmann v. Loudoun Cnty. Bd. of Educ., 118 F.3d 996, 1001 (4th Cir. 1997) ("These principles reflect the IDEA's recognition that federal courts cannot run local schools. Local educators deserve latitude in determining the individualized education program most appropriate for a disabled child. The IDEA does not deprive these educators of the right to apply their professional judgment. Rather it establishes a 'basic floor of opportunity' for every handicapped child.") (citing Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley, 458 U.S. 176, 198 (1982)); D.F. ex rel. M.F. and S.F. v. Smith, No. PJM 18-93, 2019 WL 1427800 at *5 (D. Md. Mar. 29, 2019) ("Once a procedurally proper IEP has been formulated, a reviewing court should be reluctant indeed to second guess the judgment of education professionals. Neither the district court nor this court should disturb an IEP simply because we disagree with its content. Rather, we must defer to educators' decisions as long as an IEP provided the child the basic floor of opportunity that access to special education and related

services provides.") (citing *Tice v. Botetourt Cty. Sch. Bd.*, 908 F.2d, 1200, 1207 (4th Cir. 1990)).

94.     The Hearing Officer abdicated his duty by explicitly disregarding the opinions of the School Board's expert witnesses, on the erroneous basis that these witnesses "lacked the capacity to provide meaningful opinions" without "daily" interaction and access to Student.  For one of the School Board's expert witnesses, Ms. Davis, the Hearing Officer also did not provide any evaluation or analysis of her testimony, including whether he found her testimony to be credible or not.

95.     The Hearing Officer's assertion that the School Board's expert witnesses could not give opinions deserving of deference concerning Student's educational programming is erroneous.  *See Q.K. v. Smith*, No. JKB-21-0283, 0222 WL 912720 at *12 (D. Md. Mar. 29, 2022) ("It would be unfair to fault Defendants for their lack of knowledge, for [the School Division] cannot be held responsible for the Parents' unilateral decision to enroll [the Student] in private schools … The Court therefore declines to adopt Plaintiffs' argument, which, taken to its logical conclusion, would mean that school officials could never receive deference when developing an IEP for a student with whom they have no prior experience.").The School Board's experts were qualified as experts in the fields of special education and autism; had direct knowledge of Student through either direct service delivery to Student or observation; had direct knowledge of the School Board's proposed program; and had direct knowledge of the unilateral private school placement through observation.

## COUNT II
## IMPROPER ADMISSION AND CONSIDERATION OF EXPERT TESTIMONY FROM NON-EDUCATIONAL EXPERTS

96.     Plaintiff realleges and incorporates by reference paragraphs 1 – 95 as if fully set forth herein.

97.     In conducting the administrative Due Process Hearing below, the Hearing Officer had a duty to ensure that his factual findings were regularly made and his fact-finding process followed the accepted norm regarding expert testimony.

98.     The Hearing Officer failed in this duty by allowing three witnesses to provide expert testimony on behalf of Parents regarding the appropriateness of the School Board's proposed IEPs, and then relying on these opinions to make his determination, despite none of these witnesses being qualified as experts in the area of education or special education.

99.      The Hearing Officer also failed in this duty by allowing Parents to introduce expert testimony regarding the appropriateness of the School Board's proposed IEPs without proper basis or evidentiary foundation.  None of the three expert witnesses had ever observed the School Board's proposed educational program for Student.  None of the three expert witnesses had ever provided direct instruction or educational services to Student in a school setting.

100.     Parents failed to carry their burden regarding expert testimony in support of their position.

## COUNT III
## FAILURE TO ADDRESS EACH ISSUE PRESENTED

101.     Plaintiff realleges and incorporates by reference paragraphs 1 – 100 as if fully set forth herein.

102.    In conducting the administrative due process hearing below, the Hearing Officer had a duty to ensure that his factual findings were regularly made and his fact-finding process followed the accepted norm by deciding each unique issue on the merits.

103.    The Hearing Officer failed in this duty by not uniquely discussing and analyzing each of the fourteen issues presented at  the Hearing for resolution.

104.    Instead, the Hearing Officer repeatedly utilized a single paragraph of conclusory findings, the meaning of which is not comprehensible.  This parroted phrasing fails to address, discuss, or resolve the majority of the issues in dispute.  In many cases, the paragraph includes language inapplicable to the issue at hand, including references to virtual learning and COVID-19 "realities" when discussing Student's programming during the 2021-2022 and 2022-2023 school years when Student was attending KTS in person and LCPS was fully operational. Nonetheless, it was copied and pasted throughout the Decision as the dispositive reasoning for resolution of most of the issues.

## <u>COUNT IV</u>
## FACTUAL FINDINGS NOT SUPPORTED, OR CONTRADICTED, BY THE EVIDENCE

105.    Plaintiff realleges and incorporates by reference paragraphs 1 – 104 as if fully set forth herein.

106.    The Hearing Officer made many "factual findings" that are not supported by the evidence or contrary to evidence supported in the hearing.  See Arlington Cnty. Sch. Bd. v. Smith, 230 F. Supp. 2d 704, 713 (E.D. Va. 2002) ("[A]n analysis of the hearing officer's fact-finding methodology, as mandated by Doyle, reveals that none of the key factual findings relied upon by the hearing officer to reach his conclusion is supported by evidence in the record.

28

Accordingly, these factual findings are entitled to 'no weight.'") (citing Doyle v. Arlington

County School Board, 953 F.2d 100, 105 (4th Cir. 1991).

107.    These findings of fact include the following:

a.  "The Child lacked the capacity to wear a mask in a school setting, consistent with COVID protocols."
b.  Student "has a negative reaction to LEA bus transportation."
c.  "The LEA and/or IEP team disregarded sufficient information, expert reports and data, etc., to provide 'one-on-one' services at home for the Child in violation of IDEA."
d.  "The Parent/Child's request for private placement was timely under IDEA."
e.  "The LEA refrained from conducting evaluations timely in violation of IDEA requirements."
f.  "The LEA refrained from exploring and/or implementing one-on-one homebound services in violation of IDEA requirements."
g.  "The Child's IDEA disability and given his circumstances since implementation of ESY services in August 2020, is severe requiring placement without exposure to general education students."

108.    The factual findings not supported by the evidence are not entitled to deference.

<u>COUNT VI</u>
**FAILURE TO CONSIDER DISPOSITIVE FACTS**

109.    Plaintiff realleges and incorporates by reference paragraphs 1 – 109 as if fully set

forth herein.

110.    The Hearing Officer failed to consider certain evidence that should have been

dispositive to one or more of the fourteen issues considered in the Decision.  This unconsidered,

dispositive evidence is documented below.

111.    The Hearing Officer concluded that "KTS provides the Child FAPE," while

omitting an admission by Student's teacher at KTS during a March 2022 IEP team meeting that

Student had made "very minimal progress" during his time up to that point at KTS.

112.    The Hearing Officer concluded that Student "thrives at KTS."  No such testimony

was provided during the four day hearing, and this conclusion was reached while omitting

objective testing data collected by KTS staff demonstrating that Student did not make progress in reading or math during the 2021-2022 school year.

113.    The Hearing Officer concluded that Student's "IDEA needs were simply not addressed by the LEA" and that Student required "access to services which are not available, at this time, from the LEA," while omitting discussion of the evidence demonstrating the significant similarities between the programming offered by LCPS within the public school setting and the programming offered at KTS, to include similar student-teacher ratios; support from related service professionals and BCBAs; and programs focused on similar or even identical goals.

114.    The Hearing Officer concluded that Student "lacked the capacity to wear a mask in a school setting", omitting evidence that Student successfully wore a face mask while attending school at KTS in-person during the 2021-2022 school year and while traveling and vacationing out of state during the 2020-2021 school year.  The Hearing Officer also omitted testimony from one of the School Board's expert witnesses that within LCPS' proposed in-person program for Student, students who demonstrated difficulty wearing masks at school received support on building mask tolerance through social stories, special visuals, and modeling – and testimony that students who had difficulty wearing masks were also provided with mask breaks and spent time outside where they were not required to wear their masks.

115.    The Hearing Officer concluded that Student "was subject to infection by COVID in a school setting due to his inability to wear a mask," while omitting evidence that in LCPS' proposed in-person program for Student during the 2020-2021 school year, precautions were taken against the spread of COVID-19, to include social distancing and plexiglass shields for

each individual student desk.  The Hearing Officer also omitted evidence that Student was able to wear a mask during the fall of 2020 while the family traveled and went on vacation.

116.    The Hearing Officer concluded that Student "provided the LEA proper notice regarding private placement in accordance with the Regulations," while omitting evidence that Parents signed an enrollment contract with KTS before notifying the School Board that they rejected the School Board's proposed placement or that they intended to withdraw Student and enroll him at a private school at public expense.

117.    The Hearing Officer did not acknowledge that the IEPs proposed by the School Board contained 90 minutes per week of direct speech-language services for Student while KTS only provides Student with 60 minutes per week of direct speech-language services.

118.    The issues considered in the Decision for which the Hearing Officer failed to consider dispositive facts are not entitled to deference.


## COUNT VII
## LACK OF NOTICE BY PARENTS

119.    Plaintiff realleges and incorporates by reference paragraphs 1 – 118 as if fully set forth herein.

120.    The Hearing Officer made a substantive error in controlling law and/or failed to apply the correct legal standard by concluding that Parents provided proper notice of their intent to enroll Student at a private school at public expense.  The last IEP meeting Parents attended before removing Student from LCPS occurred on June 15, 2021. Although Parents requested that the IEP team consider whether Student required a private day school placement at this meeting, at no time during the meeting did Parents notify the School Board that they were rejecting the

School Board's proposed placement or that they intended to withdraw Student and enroll him at a private school at public expense.  Evidence also demonstrated that Parents signed an enrollment contract with KTS on August 11, 2021, prior to the date on which Parents notified the School Board of its intent to unilaterally enroll Student at KTS and to seek public funding for this placement.

121.    Because the Decision incorrectly concluded that Parents provided the School Board with proper notice that they intended to privately place Student at public expense, as required by the IDEA, the Hearing Officer's Decision is not entitled to deference.

**COUNT VIII**
**LACK OF CLEAR AND UNDERSTANDABLE RELIEF TO PREVAILING PARTY**

122.    Plaintiff realleges and incorporates by reference paragraphs 1 – 121 as if fully set forth herein.

123.    The Decision fails to articulate a clear and understandable grant of relief to the prevailing party.  In his Decision, the Hearing Officer states that the School Board must reimburse Parents for "enrollment at KTS" and for costs associated with the "Neuropsychological Report and Speech/Audio Evaluation."  The Hearing Officer does not clearly define what expenses must be reimbursed that are associated with Student's "enrollment" at KTS or Parents' procurement of the above-referenced evaluations.

124.    Parents recently filed a complaint with the Virginia Department of Education asserting that the Hearing Officer's decision awards Student an indefinite private day school placement moving forward.  While the School Board does not agree with Parents' position, Parents' complaint reinforces that the Hearing Officer's decision does not articulate a clear and understandable grant of relief to the prevailing party.

125.     Because the Decision lacks a clear and understandable grant of relief to the prevailing party, it is not entitled to deference.

## COUNT IX
## FAILURE TO CONSIDER APROPRIATENESS OF EACH PROPOSED IEP

126.     Plaintiff realleges and incorporates by reference paragraphs 1 – 125 as if fully set forth herein.

127.     The Hearing Officer made a substantive error in controlling law and/or failed to apply the correct legal standard because he did not independently evaluate the appropriateness of each IEP proposed by the School Board during the time period at issue in the hearing.  Instead, the Hearing Officer summarily concluded, without explanation, that all of the School Board's proposed IEPs, combined, were inappropriate.

128.     The School Board's proposed IEPs cannot be adjudicated collectively because each proposed IEP was informed by newly available information not available to previous IEP teams.  For example, Dr. Lucker's July 2022 evaluation report was not available to the IEP team that developed Student's proposed June 15, 2022 IEP.  Under the IDEA, the appropriateness of an IEP can only be adjudicated based upon the information that was available to the IEP team at the time the IEP was proposed. See Schaffer ex rel. Schaffer v. Weast, 554 F.3d 470 (4th Cir. 2009) ("Judicial review of IEPs under the IDEA is meant to be largely prospective and to focus on a child's needs looking forward; courts thus ask whether, at the time an IEP was created, it was 'reasonably calculated to enable the child to receive educational benefits' …  this prospective review would be undercut if significant weight were always given to evidence that arose only after an IEP were created.") (citing Rowley, 458 U.S. at 207). By adjudicating the School Board's IEPs collectively, the Hearing Officer necessarily adjudicated the appropriateness of

some of the School Board's proposed IEPs utilizing information not available to the IEP team at the time the IEP was created.  Because the Decision was based, in part, on an error of law, it is not entitled to deference.

## COUNT X
## MISALLOCATION OF THE BURDEN OF PROOF

129.   Plaintiff realleges and incorporates by reference paragraphs 1 – 128 as if fully set forth herein.

130.   The Hearing Officer made a substantive error in controlling law and/or failed to apply the correct legal standard by incorrectly attributing the burden of proof on several issues to the School Board rather than Parents.

131.   Parents bore the burden of proof in the administrative Due Process Hearing. The Hearing Officer erroneously concluded that the School Board failed to present "persuasive evidence" that "KTS did not provide the Child the least restrictive environment in accordance with IDEA" and that "KTS did not provide FAPE."  Parents, not the School Board, bore the burden of proof to demonstrate that the School Board's proposed public day school program is not Student's least restrictive environment.  Parents, not the School Board, also bore the burden of proof to demonstrate that the School Board's proposed public day school program is not appropriate and that KTS was appropriate.

132.   Because the Decision was based, in part, on an error of law, it is not entitled to deference.

## COUNT XI
## FAILURE TO CONDUCT *BURLINGTON* ANALYSIS

133.   Plaintiff realleges and incorporates by reference paragraphs 1 – 132 as if fully set forth herein.

34

134.    The Hearing Officer made a substantive error in controlling law and/or failed to apply the correct legal standard because he failed to utilize and apply the correct legal standard articulated in Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass., which requires that in cases involving a request for private school tuition reimbursement, a parent must demonstrate that "(1) the public school's placement was not providing the child with a free appropriate public education; and (2) the parents' alternative placement was proper under IDEA." 471 U.S. 359, 369-70 (1985).

135.    The Hearing Officer emphasizes in the introduction to his legal analysis that his findings were based upon the fact that the "information from KTS was undisputed."  A determination that a private day school program is appropriate does not, by itself, demonstrate that a School Board's proposed public day school program is not appropriate.  The Hearing Officer failed to conduct the required Burlington analysis in reaching his determination.

136.    Because the Decision was based, in part, on an error of law, it is not entitled to deference.

<u>**COUNT XII**</u><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW BASED ON IRREGULAR PROCESS AND CONTRARY TO LAW AND EVIDENCE**

137.    Plaintiff realleges and incorporates by reference Paragraphs 1 – 136 as if fully set forth herein.

138.    The Hearing Officer's factual findings and legal conclusions are unsupported by a preponderance of the evidence; therefore, the Hearing Officer's consideration of evidence and testimony is not entitled to deference.

139.    The Hearing Officer's factual findings and legal conclusions with respect to the School Board's proposed IEPs were also not supported by expert testimony from professional educators; therefore, the Hearing Officer's factual findings and legal conclusions are not entitled to deference.

140.    Based on an irregular process and contrary to the law and evidence, the Hearing Officer erroneously concluded that Student had been denied a FAPE and affirmed the Defendants unilateral prior placement of Student in private day school.

141.    Because the Decision was based on errors of process, fact, and law, it is not entitled to deference.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff Loudoun County School Board respectfully request this Court:

(a)    Receive additional evidence as permitted by 20 U.S.C. 1415 (i)(2)(C)(ii);

(b)    Reverse and vacate the Hearing Officer's December 9, 2022 Decision;

(c)    Find that LCPS provided FAPE to Student during the 2020-2021, 2021-2022, and 2022-2023 school years;

(d)    Find that LCPS identified Student's special education needs in accordance with the IDEA during the 2020-2021, 2021-2022, and 2022-2023 school years.

(e)    Find that the public school program through LCPS is an appropriate placement and the least restrictive environment for Student;

(f)    Find that the Schools Board's proposed IEPs during the 2020-2021, 2021-2022, and 2022-2023 school years provide Student with FAPE within the least restrictive environment for Student in compliance with IDEA;

(g)     Enter an order granting judgment in its favor, and against Defendants, based on

        (a) – (f); and,

(h)     Grant the School Board all other relief as the Court may deem appropriate.

                                Respectfully submitted,

                                **LOUDOUN COUNTY SCHOOL BOARD**

                                By Counsel

/s/ _____
Matthew D. Green (VSB No. 46913)
Jason H. Ballum (VSB No. 65241)
Anne Mickey (VSB No. 88116)
SANDS ANDERSON PC
1111 East Main Street, Suite 2400 (Zip: 23219)
P.O. Box 1998
Richmond, Virginia  23218-1998
Telephone: (804) 648-1636
Facsimile: (804) 783-7291
mgreen@sandsanderson.com
jballum@sandsanderson.com
amickey@sandsanderson.com
*Counsel for Loudoun County School Board*