IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| LOUDOUN COUNTY SCHOOL BOARD, | ) | |
| Plaintiff-Counter Defendant, | ) | |
| | ) | |
| v. | ) | Civil No. 1:23cv320 (DJN) |
| | ) | |
| HEIDI BUNKUA, *et al.*, | ) | |
| Defendants-Counterclaimants. | ) | |
| | ) | |

**<u>MEMORANDUM OPINION</u>**

Plaintiff-Counter Defendant Loudoun County School Board ("LCPS," the "School Board" or the "LEA") brings this action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, to challenge a Hearing Officer's decision that LCPS failed to provide K.B., a disabled child, with a free appropriate public education as required by the IDEA. Defendants-Counterclaimants Theerayut Bunkua and Heidi Bunkua ("Defendants") cross-petition for attorney's fees and costs. This matter now comes before the Court on the parties' cross motions for judgment on the administrative record. (ECF Nos. 21, 31).[1] The motions have been fully briefed and were argued orally on December 1, 2023. For the reasons that follow, the Court will DENY LCPS's Motion (ECF No. 21) and GRANT Defendants' Motion (ECF No. 31).

---

[1] The parties, who did not conduct discovery, both agree that judgment on the administrative record is appropriate. *See Cnty. Sch. Bd. of Henrico Cnty. v. Z.P. ex rel. R.P.*, 399 F.3d 298, 309 n.7 (4th Cir. 2005) (explaining that "IDEA actions . . . should typically be disposed of by motions for judgment," as district courts are "entering judgment after what amounts to a bench trial" even if the court "proceed[s] on the basis of an unsupplemented administrative record") (internal quotations omitted); *E.R. ex rel. E.R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 762 (5th Cir. 2018) (noting that this is "the norm" in IDEA cases).

# I.   BACKGROUND

Before fully expounding the protracted and intricate record in this matter, three issues merit discussion at the outset.

First, a basic primer on the IDEA will prove helpful in navigating the subsequent factual record.  In brief, the IDEA requires local school districts to provide a free appropriate public education to disabled students.  This primarily occurs under Individualized Education Programs ("IEPs"), which identify a child's unique needs and the school's plan for meeting those needs. IEPs are formed in consultation with parents and school officials.  When parents and educators disagree, the IDEA offers several dispute resolution mechanisms, one of which is an administrative proceeding known as a "due process hearing," in the parlance of the IDEA.  That proceeding is conducted by an impartial hearing officer, who issues a final decision subject to judicial review.  If the hearing officer finds that a school district failed to provide a disabled student with a free appropriate public education, she may order the school district to assume the cost of enrolling the student at a private school that can meet the student's needs.

Second, the IDEA embodies the "acronymic world of federal legislation." *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 158 (2017).  The Court endeavors to redefine its terms with some frequency.  But for ease of reference, the legend in Section V of this Opinion contains every three-lettered phrase that the Court has encountered in its journey through the record.

Third, although the record in this case spans multiple years, that record stands subject to the IDEA's statute of limitations, which confines the operative window to August 2020, two years before Defendants initiated a due process hearing.  20 U.S.C. § 1415(f)(3)(C).  The Court thus considers facts before August 2020 only for purposes of context.  *See M.B. v. Fairfax Cnty.*

*Sch. Bd.*, 660 F. Supp. 3d 508, 514 (E.D. Va. 2023) (explaining that facts outside the statute of limitation may "appropriately [be] considered" because they "provide context for the decisions made").  With this in mind, the following facts are derived from a review of the administrative record.

### A.      Public School

K.B. is an eleven-year-old child currently eligible for Special Education and Related Services ("SPED") under the IDEA categories of Autism, Speech Language Impairment and Other Health Impairment.[2]  (Administrative Record ("AR") (ECF No. 19) at AR1, AR195–96, AR1060–61).  K.B.'s disabilities first manifested in 2013, when K.B., then fifteen months old, enrolled at Minnieland Academy preschool.  (AR667).  Within six months, K.B. was asked to leave over behavioral concerns.  (*Id.*)  His parents enrolled him at Winwood Children's Center, where faculty reported that K.B. suffered from separation anxiety.  (*Id.*)  Both institutions expressed concern about K.B.'s lack of speech, participation, and responsiveness to his own name.  (*Id.*)

In March 2015, at 2.5 years old, K.B. qualified for SPED under the category of Autism. (AR677).  Based on this eligibility, K.B. received special education services through the Early Childhood Special Education ("ECSE") program at Discovery Elementary School.  (*Id.*)  He also began occupational, speech, and language therapy as related services.  From August 2017 to March 2020, K.B. attended kindergarten, first and second grade at LCPS, primarily as a student in the K–2 Autism Program located at Little River Elementary School.  (*Id.*)  The program consisted of eight students, one teacher, two teaching assistants and several support personnel —

---

[2]      To qualify as disabled under the IDEA, a child must have one of a list of enumerated disabilities.  20 U.S.C. § 1401(3)(A)(i); 34 C.F.R. § 300.8(a)(1).

such as an occupational therapist, speech language therapist and paraprofessionals — who would cycle through the classroom.  (AR228–29).  K.B. also attended a portion of his classes in a general education setting.  (AR3812).

In the spring of 2020, Defendants moved to a new residence within LCPS's jurisdiction zoned for Goshen Post Elementary School ("GPES"), where K.B. would complete third grade.  (AR667, AR1198, AR3107–08).  Around this same time, the COVID-19 virus began rapidly spreading throughout the United States.  By March 2020, Virginia's Governor ordered public schools across the Commonwealth to close for in-person instruction.  *See* Exec. Order No. 53, 36 Va. Regs. 2115 (terminating "all in-person instruction at K–12 schools . . . for the remainder of the 2019–2020 school year," *i.e.*, for spring 2020 and the summer 2020 extended school year ("ESY")).  These closures forced LCPS to rapidly employ a novel learning model; as one school official explained, "this new kind of structure of distance learning" had to be implemented within "the course of four days."  (AR2315).

On July 6, 2020, LCPS notified parents of its response to the Governor's order and told them that schools would reopen for the 2020–2021 academic year offering two options:  (i) a hybrid model, with students attending in-person class for two days each week and engaging in remote learning for the remaining three days, or (ii) fully virtual learning with no in-school attendance.  (AR1199, AR1201–02).  A parent's choice between these options would be binding at least for a student's first semester, *i.e.*, from August 2020 to January 2021.  (*Id.*)[3]  Defendants

---

[3]     The pandemic proved uncooperative with the School Board's plans.  LCPS did not begin offering any in-person instruction until October 13, 2020, and even then, it was only beginning to "phas[e] in" students for hybrid learning two days per week.  (AR1060, AR2316).  LCPS increased in-person learning to four days per week on November 17, 2020, but all students returned to fully virtual learning less than one month later due to a rise in COVID-19

did not feel comfortable with K.B. returning to in-person instruction.  Their primary trepidations were that K.B. would be unable to wear a face mask, adhere to social distancing protocols, or take medication if he contracted COVID-19.  (AR195, AR232, AR3120).  K.B. also experienced anxiety whenever he left home.  (*Id.*)  Defendants thus elected to have K.B. remain in a fully virtual education program for the 2020–2021 academic year.  (AR3312–15, AR3699–700).

Unfortunately, remote learning proved calamitous for K.B.  Throughout the summer of 2020, Defendants expressed concern to LCPS that it had failed to plan for pandemic mitigation measures or to communicate those measures to parents.  (AR610).  This failure, in Defendants' view, led to LCPS adopting IEPs that were not tailored to K.B.'s individualized needs and caused K.B. to lose learning opportunities in the summer ESY.  (*Id.*)  Without proper support, K.B. floundered.  Before remote learning, K.B. "never pushed or slapped or kicked out of frustration."  (AR2309).  Now, he regularly screamed, cried, destroyed property and hit and kicked objects and people.  (AR194, AR3104–06, AR3110–12).  Previously, K.B. was capable of devoting "over 20 minutes" to a task.  (AR2310).  Now, he could only sit "for 30 seconds to three minutes" before succumbing to restlessness, even when he was engaged in playful activities.  (*Id.*)

These behavioral challenges were only exacerbated by K.B.'s persistent absenteeism.  As of June 2020, K.B. had missed 20 to 40% of his online classes.  (AR 888–89).  By the following school year (2020–2021), K.B. was missing 70% of his learning opportunities on Mondays and 40% of his learning opportunities over the remainder of the week.  (AR928–29).  Defendants worked in good faith to facilitate K.B.'s access to his virtual curriculum, but his disabilities

transmission.  (*Id.*).  It was not until February 16, 2021, that LCPS reopened the schoolhouse for in-person instruction.  (*Id.*)

prevented proper participation.  (AR232 ¶¶ 8, 12–13).

In the late summer and fall of 2020, Defendants informed LCPS that K.B. could not learn virtually, because he could not use the features of the school's virtual learning platform. (AR2310).  These difficulties fostered a revulsion towards computers in K.B., and his negative behaviors escalated whenever he had to be online.  (*Id.*)  K.B.'s frustrations with his learning environment soon developed into a dissatisfaction with school in general.  K.B. described school as "bad" and associated it with other negative things, like guns, that he knew to avoid.  (*Id.*) LCPS insisted that Defendants should direct their efforts towards improving the virtual learning experience rather than looking for an alternative, because no other options were available. (AR2315–16).  School officials also obliquely implied that Defendants bore some responsibility for K.B.'s dour state, as they "cho[se] . . . distance learning" rather than sending K.B. to school in person.  (*Id.*)

With K.B. continuing to struggle, on August 27, 2020, Defendants asked LCPS to test K.B. to gauge his regression.  (AR2292).  Defendants noted that K.B.'s previous assessments had been conducted "before everything shut down," and that a proper IEP could not be planned when the School Board did not "know [K.B.]'s present level [of] performance."  (AR2294–95).  LCPS indicated that it would "try[]" to conduct Measure of Academic Performance ("MAP") testing of all students, including K.B., in the fall of 2020.  (AR2297–98).  That offer did little to quell Defendants.  In their view, MAP and similar tests had repeatedly failed to accurately assess K.B., because the tests could not distinguish K.B. not knowing an answer to a question from K.B. not understanding the question itself.  (AR2296).  Defendants asked the School Board to instead conduct speech and other evaluations that they believed would better reflect K.B.'s condition.

(AR2298–99).  LCPS refused.  It explained that insufficient time had passed since K.B.'s previous speech evaluation, and that any data gathered would be of limited utility, because the school would only conduct testing virtually.  (AR2299–2301).  Defendants insisted that K.B.'s needs could not be met until he received a proper evaluation, but the School Board stood resolute.  (AR2303).  Although LCPS did not "want it to look like [it was] not addressing [Defendants'] area of concern," it believed that speech and language evaluations were simply not "necessary." (AR2302).

Defendants remained unconvinced.  So they obtained counsel and requested another IEP meeting, which was held on September 14 and 17, 2020.  This time, school officials acquiesced to new testing.  (AR233 ¶ 20, AR2326, AR2345–46).  Between September and December of 2020, K.B. underwent a series of evaluations.  (AR652).  Those evaluations revealed that K.B. fell below standards for his age group in several categories, including social-emotional, language, cognitive, and mathematics development.  (AR653).  Specifically:

- A speech language evaluation found that a familiar, trained listener would find K.B. only 51% intelligible and that his speech, as an eight-year-old, reflected a development range of 3.4 to 3.8 years of age.  (A668–69, AR671).  K.B. received a diagnosis of Mixed Receptive Expressive Language Disorder, Expressive Language Disorder and a Phonological Disorder.  (*Id.*)

- An occupational therapy evaluation found that although K.B. could write all letters of the alphabet, he often omitted or reversed letters when writing.  (AR674–76).  The evaluation deemed K.B. capable of using a keyboard and interacting over the computer only if he received cuing and parental support, and with movement breaks to maintain his attention.  (*Id.*)  Completing virtual tasks required a parent to remain in close proximity throughout the assignment.  (*Id.*)

- An education evaluation found that K.B. could identify letters and letter sounds, but that he could not use ordinary word attack strategies to comprehend words with which he was unfamiliar.  (AR680).  Although K.B. could transcribe up to double-digit numbers, he struggled with simple addition.  (AR680–81).  He was also unable to spell basic words.  (*Id.*)  The evaluation concluded that K.B. performed "well

7

below expected levels for a student his age across all areas."  (AR682).

- A psychological evaluation found that K.B. struggled to focus and understand directions.  (AR686).  He labored to make eye contact, looked away from his screen frequently during class instructions, and required repeated redirection from his mother and teachers to complete tasks.  (AR689–91, AR697–98).  His cognitive scores were rated below average to deficient.  (AR686, AR701).

To arrest K.B.'s decline, Defendants asked LCPS for a school staff member who could work with K.B. one-on-one at home.  (AR662).  LCPS denied their request in October 2020.  (*Id.*) Defendants renewed their request the following month (AR673), which LCPS again rejected in February 2021.  (AR827).  Defendants made a final plea for one-on-one support, but to no avail. LCPS denied that request in June 2021.  (AR920).  LCPS instead proposed that K.B. attend in-person instruction at GPES.  (AR662–64, AR824–29, AR919–21).  LCPS also proposed several solutions to assist K.B. with virtual learning, including use of a school-issued Chromebook and second monitor, shorter assignments, positive reinforcement, and greater coordination between school personnel and K.B.'s private behavioral therapists.  (AR795–96, AR830).  Defendants implemented these recommendations where practicable, but they felt that some of the purported solutions would only exacerbate K.B.'s sensory overload.  (AR3685–86).  Defendants were particularly perplexed by the School Board's insistence that it lacked sufficient data to justify at-home support.  This created, in Mr. Bunkua's words, a "catch 22" — the only way to prove that K.B. required an at-home aide was to send him to school to gather the data necessary to justify out-of-school services.  (AR3684–85).  But at-home care was necessary precisely because K.B. could not return to GPES.

Defendants also believed that K.B.'s evaluations revealed that his eligibility for Special Education and Related Services had been unduly circumscribed.  In addition to K.B.'s Autism

qualification, Defendants asserted that K.B. should be eligible for SPED under the categories of

Other Health Impairment ("OHI"), Specific Learning Disability ("SLD") and Speech Language

Impairment ("SLI").  (AR711–14).  Amending K.B.'s qualifying disabilities could alter the

intervention strategies provided to him.  In December 2020, LCPS concluded that K.B. satisfied

the disability criteria for SLI, but not the criteria for OHI or SLD.  (AR716 (OHI), AR719 (SLI),

AR723 (SLD); *see also* AR883, AR1060).  Defendants disagreed with LCPS's diagnoses and

requested Independent Educational Evaluations ("IEE"), which LCPS agreed to fund.  (AR726–

28).[4]

     Dr. William Ling, a clinical psychologist, evaluated K.B. across three sessions spanning

February and March 2021.  (AR1363).  As Dr. Ling observed, K.B. suffered from "articulation

issue[s]," a "clear impairment in verbal cognitive abilities," "marked limitations in his basic

literacy skills" and problems with "sustaining focus on external demands." (AR1367–69).  In

particular, K.B. demonstrated acute difficulty with processing verbal information, which

"significantly interfered in [K.B.]'s ability to improve in his academic functioning."  (AR1370,

AR1385).  Dr. Ling's findings led him to make a series of recommendations, which included

placing K.B. in a smaller academic setting with new protocols tailored to his needs.  (AR1386–

87).

     Based on Dr. Ling's IEE, the parties agreed to convene for an IEP meeting, which was

held in May 2021.  At that meeting, Dr. Ling recommended that the school expand K.B.'s

---

[4]     When parents disagree with a school's evaluation, the IDEA and its implementing
regulations guarantee parents the right to obtain, at public expense, an evaluation from a
qualified independent examiner, unless the school files a timely complaint that requests a hearing
to show that the school's evaluations are appropriate.  20 U.S.C. § 1415(b)(1); 34 C.F.R.
§ 300.502.

qualifying disabilities.  (AR2572–73, AR2577).  Due to Dr. Ling's evaluations, LCPS once again amended K.B.'s SPED eligibility to reflect Autism, SLI and OHI.  LCPS's addition of OHI was based on diagnoses of ADHD and sensory processing disorder.  (AR866–67, AR872–74, AR919, AR1060).  The School Board continued to deny eligibility under Specific Learning Disability.  (AR878).  Dr. Ling disagreed with that decision; in his view, the data were "fully consistent" with what he would expect from a child with an SLD.  (AR2583–84).

In June 2021, LCPS informed Defendants that the School Board was granting K.B. an additional accommodation based on Dr. Ling's IEE and K.B.'s new SPED eligibility.  (AR2596–97).  In LCPS's words, K.B. would be offered "time to process what is asked" of him, rather than "repeat[ing] over and over again a question."  (*Id.*)  This "wait time" was the only new modification that LCPS proposed.  (*Id.*)  Defendants were unimpressed, and they renewed their request for one-on-one support.  (*Id.*)  LCPS repeated its familiar refrain that it lacked adequate data and that K.B. should instead attend in-person instruction at GPES.  (AR2598).  In response, Mrs. Bunkua broached changing K.B.'s educational placement to a private day school.  (AR2601–02).  She explained that K.B.'s needs had gone unmet in public school for years, because he had been misdiagnosed, and that Dr. Ling's findings only confirmed that K.B. needed individualized care unavailable at GPES.  (*Id.*)  LCPS rejected private placement.  (AR919–21).  The School Board instead recommended that K.B. be placed in a Grade 3 to 5 self-contained autism classroom at GPES.  (AR3823–24).

In July 2021, acting on the recommendation of Dr. Ling, Defendants consulted Dr. Jay Lucker, an audiologist and speech-language pathologist.  (AR1386 ¶ 5, AR1397).  Dr. Lucker examined K.B. and found that K.B. suffered from multiple articulation problems, which reflected

a possible underlying motor speech problem.  (AR1409).  Dr. Lucker assessed K.B.'s language

comprehension to be around a preschool to kindergarten level and measured his understanding

and use of grammar at well below preschool level.  (AR1410).  K.B. could repeat words but had

more difficulty with processing their meaning.  (*Id.*)  K.B. particularly struggled to express

himself.  (AR1411).  Dr. Lucker concluded that K.B. required language therapy, a quiet,

distraction-free environment, and a system of Applied Behavior Analysis ("ABA") to learn.

(AR1411–13).

On August 11, 2021, Defendants enrolled K.B. at Katherine Thomas School ("KTS"), a

private school for students with disabilities in Rockville, Maryland.  (AR922–24).  Dr. Ling

recommended KTS to Defendants based on his experience working with the school and children

suffering from similar neurological challenges.  (AR200 (quoting AR3219, AR3232–33)).  Five

days later, on August 16, Defendants informed LCPS of their decision.  (AR926).  By this time,

Defendants and LCPS had convened nearly a dozen times to review and amend K.B.'s IEPs.

(AR1060–61).  Despite these repeated efforts, Defendants felt that K.B.'s multiple sensory,

processing, and language-based needs — identified by Dr. Ling and Dr. Lucker — were

unaddressed by LCPS.  (AR3688).

### B.    Private Placement

K.B. began the fourth grade at KTS in September 2021.[5]  At the start of the school year,

KTS conducted its own assessment of K.B. to develop Diagnostic Prescriptive Goals and

---

[5]     KTS placed K.B. in its Student Transitional Readiness through Intensive Development
Education ("STRIDE") program for students "with diagnosed language and learning disabilities,
other health impairments, intellectual disabilities, and or autism, who may also display
difficulties in other development areas."  (AR1555).

Annotations ("DPGs") to address his learning needs.[6]  (AR1529).  Those assessments indicated that K.B.'s abilities fell far below his grade level.  (*See, e.g.*, AR1534–35 (reflecting a mathematics score comparable to a kindergartener and a reading score of a first grader)).  KTS proposed a litany of accommodations in response.  (AR1532–33).

Meanwhile, LCPS's IEP team met with Defendants in January 2022 to discuss K.B.'s move to KTS.  (AR2630).  If the School Board agreed that private enrollment was necessary to provide K.B. a free appropriate public education, then his tuition at KTS would be covered at public expense.  Defendants believed that LCPS had received new data from KTS that justified K.B.'s private placement, but due to an apparent bureaucratic error (a dispute over the scope of a release form), LCPS received no such data.  (AR198, AR2635–36).  The parties agreed to reconvene for a follow-up meeting, which was held on March 28 and April 1, 2022.  (AR2646, AR2684).  Dr. Lucker and three members of KTS's staff — K.B.'s teacher, an IEP coordinator, and KTS's director — also participated.  (AR2647–48).  Dr. Lucker explained the findings of his July 2021 evaluation of K.B. (AR2649–54), and KTS's employees walked through how they implemented those findings in their classroom, including by instructing K.B. "in very small groups," offering several additional hours of "push-in" services (specialized support, such as speech language services) and providing a Board-Certified Behavior Analyst ("BCBA") to help implement K.B.'s behavioral plan.  (AR2657–58, AR2693–94).  KTS explained that although K.B. had only made "baby steps" towards his goals, (AR2622), it believed that he was on track to achieve his DPG goals by the end of the IEP year.  (AR2706–07).

Based on Dr. Lucker's findings and KTS's DPG, LCPS proposed keeping (with one

---

[6]    KTS uses DPGs in the same manner that public schools use IEPs.  (AR3338–40).

addition) the goals in K.B.'s May 2021 IEP with several new accommodations.  (AR1041, AR1044).[7]  LCPS also proposed changing the balance between special education and general education that K.B. would receive.  (*Id.*)  Pre-COVID, Defendants sought to place K.B. in a general education classroom "to the maximum extent appropriate" to allow him to engage with his non-disabled peers.  (AR1043).  Because Defendants now understood that a small setting was most efficacious to K.B., LCPS agreed that K.B. would spend all but 50 minutes per week in a special education setting.  (*Id.*)  But LCPS believed that it would be a mistake to wholly extricate K.B. from general education.  (*Id.*)  With these adjustments, LCPS determined that K.B.'s needs could be met in the public school setting.  (*Id.*)  LCPS believed that K.B.'s program at KTS was similar to the program offered at GPES, and that that K.B. could "benefit from spending some time . . . alongside non-disabled peers," an opportunity that K.B. lacked at KTS.  (*Id.*)  For these reasons, the School Board refused to grant public reimbursement for K.B.'s private schooling.

Defendants informed LCPS that, before accepting or rejecting LCPS's proposed IEP, they wished to share the IEP with K.B.'s caregivers.  (AR1043).  Defendants asked Dr. Ling, Dr. Lucker and Sherry Csutoros (a private BCBA consultant who provided Applied Behavioral Analysis ("ABA") services to K.B. at his home) for their input.  (AR3187).  They unanimously disapproved.  Dr. Ling stated that the IEP failed to provide "sufficient breadth []or specificity . . . to address [K.B.'s] specific needs," such as auditory and language processing issues.  (AR3225–228).  This was particularly concerning to Dr. Ling, because K.B.'s "therapeutic window [was] closing." (AR3230).  In other words, as K.B. grew older, the efficacy of any intervention would

---

[7]      The IEP refers to an additional goal based on Dr. Ling's report, but this appears to be an error.  The preceding paragraph discusses the "private report completed by Dr. Jay Lucker," and it was Dr. Lucker who participated in the precipitating IEP meeting.  (*Id.*)

diminish, so the risk of mistreating K.B. in 2022 could have lifelong consequences.  Dr. Lucker

similarly flagged a dearth of meaningful auditory and language processing goals and noted that

the IEP failed to identity the "foundation[al] skills" that K.B. needed to reach the other goals of

the IEP.  (AR3592–95).

In May and July 2022, LCPS conducted in-person observations of students at KTS.

(AR1051–59, AR1061).  Following those observations, LCPS and Defendants convened for a

final IEP meeting on August 18, 2022.  LCPS informed Defendants that it had updated K.B.'s

IEP based on data from KTS.  (AR2720; AR1122–1125).  But those data failed to persuade the

School Board that K.B. required private placement.  (*Id.*).  Defendants predictably felt otherwise.

(AR1121).

C.     **Procedural History**

With the parties at an impasse, Defendants initiated due process proceedings with the

Virginia Department of Education ("VDOE") on August 22, 2022.  (AR2, AR23).[8]  Defendants'

administrative complaint alleged that LCPS failed to provide K.B. with a free appropriate public

education ("FAPE") and requested a hearing to resolve LCPS's obligations to K.B.  (AR1–2).

Hearing Officer Robert J. Hartsoe identified fourteen issues for resolution at the due process

hearing from the parties' briefs and arguments:

1.  Whether the local education agency ("LEA") failed to identify K.B.'s Special Education
    Needs in accordance with IDEA for school year 2020–21?

2.  Whether the LEA failed to identify K.B.'s Special Education Needs in accordance with
    IDEA for school year 2021–22?

---

[8]     A due process proceeding is an adjudicatory procedure used to resolve disagreements
between parents and a school over "the identification, evaluation, or educational placement of [a]
child, or the provision of a free appropriate public education to such child."  20 U.S.C.
§ 1415(6)(A).

3. Whether the LEA failed to identify K.B.'s Special Education Needs in accordance with IDEA for school year 2022–23?

4. Whether the LEA provided a FAPE during school year 2020–21?

5. Whether the LEA provided a FAPE during school year 2021–22?

6. Whether the LEA provided a FAPE during school year 2022–23?

7. Whether the LEA provided K.B. with an appropriate placement in accordance with IDEA for school year 2020–21?

8. Whether the LEA provided K.B. with an appropriate placement in accordance with IDEA for school year 2021–22?

9. Whether the LEA provided K.B. with an appropriate placement in accordance with IDEA for school year 2022–23?

10. For the 2021–22 school year, whether Defendants should be reimbursed for costs arising from private placement?

11. Whether Defendants should be reimbursed for costs for private evaluations described in the Due Process request?

12. Whether the issues raised by the Due Process Request are barred, in whole or in part, by the statute of limitations?

13. Whether the IEP team, assembled for the IEP meeting conducted on June 6, 2022, was consistent with the IDEA and, if not, was K.B. denied FAPE as a result?

14. Whether the IEP team, assembled for the IEP meeting conducted on August 18, 2022, was consistent with IDEA and, if not, was K.B. denied FAPE a result?

(AR68–69).  Officer Hartsoe held a four-day hearing in October 2022.  Defendants called eight

witnesses and LCPS called three witnesses.  (AR193, AR221).[9]  On December 9, the Hearing

---

[9]     The Hearing Officer's Decision incorrectly states that Defendants called seven witnesses. Eight testified on their behalf.  (*See* AR3087–88, AR3463).

Officer resolved each of the substantive issues against LCPS.[10]  Officer Hartsoe found that "the overwhelming evidence" supported the conclusion that LCPS "failed to identify [K.B.]'s [] needs," failed "to generate [] viable . . . IEPs," and "failed to . . . allow [K.B.] to receive [a] FAPE."  (AR245).  The Hearing Officer deemed Defendants' witnesses "credible and very persuasive," while LCPS's witnesses "appeared to be focused on issues outside of [K.B.]'s IDEA requirements."  (AR246).

The Hearing Officer's Decision recited 86 discrete findings of fact.  (AR232–237).  To summarize those findings, Officer Hartsoe concluded that (i) K.B. could not safely attend school in-person during the pandemic; (ii) virtual instruction by LCPS denied K.B. a FAPE; (iii) LCPS unreasonably denied one-on-one home services to K.B. despite possessing sufficient data to conclude that such intervention was essential; (iv) LCPS withheld necessary evaluations of K.B. until Defendants retained counsel; (v) K.B.'s IEPs failed to provide a FAPE; (vi) KTS arrested K.B.'s decline and he "thrive[d]" at that school; (vii) LCPS remained unable to provide K.B. a FAPE; and (viii) in consequence, K.B. belonged at KTS.  (*Id.*).  Based on these findings, Officer Hartsoe ordered that Defendants be reimbursed for (1) enrollment at KTS and (2) the private evaluations of K.B. conducted by Dr. Ling and Dr. Lucker.  (AR251–52).

On March 9, 2023, LCPS filed this lawsuit to challenge the Hearing Officer's findings and vacate the Decision.  (ECF No. 1).  Defendants brought a separate action for attorney's fees and costs.  *See K.B. ex rel. Bunkua v. The Sch. Bd. of Loudoun Cnty.*, 1:23cv321 (E.D. Va. Mar. 9, 2023) (ECF No. 1).  Senior District Judge T.S. Ellis, III consolidated the two cases on June 8, 2023.  (ECF No. 8).  On October 4, Defendants filed a motion for stay-put placement at KTS.

---

[10]      Neither party disputed the applicability or scope of the statute of limitations.  (AR251).

(ECF Nos. 14).  That motion was granted in part and denied in part approximately two weeks later.  *See Loudoun Cnty. Sch. Bd. v. Bunkua et al.*, 2023 WL 7015284, at *1 (E.D. Va. Oct. 25, 2023) (ECF No. 24).  Judge Ellis held that KTS remains "K.B.'s stay-put placement during the pendency of this litigation," but he denied Defendants any relief that was not granted by the Hearing Officer.  *Id.* at *4.  Following that decision, the parties filed opposing cross motions for judgment on the administrative record.  Briefing on those motions concluded shortly before the start of the new year.  On January 18, 2024, this matter was reassigned to the undersigned.  (ECF No. 35).

## II.     LEGAL STANDARD

In the mid to late 20th century, the national government undertook a heroic effort to end generations of segregation in American public schools.  Title IV of the Civil Rights Act of 1964 desegregated public schools and colleges.  Pub. L. 88–352, title IV, § 401.  Title VI barred federally funded entities from engaging in discrimination.  *Id.* title VI, § 601.  Title IX of the 1972 Education Amendments prohibited sex discrimination in education.  Pub. L. 92–318, title IX, § 901.  Congress sought to do the same for disabled children.  It first experimented with grant programs in 1966 and 1970 to assist States in educating the disabled.  *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 179–180 (1982) (discussing this history).  This proved ineffective.  So Congress moved to pair its funding with a requirement that States commit to "providing full educational opportunities to all handicapped children."  Pub. L. 93–380, § 613, 88 Stat. 579, 583 (1974).  The resulting compromise was the Education for all Handicapped Children Act of 1975, which was retitled in 1990 to the Individuals with Disabilities Education Act.  *See* Education of the Handicapped Act

17

Amendments of 1990, Pub. L. 101–476, § 901(a), 104 Stat. 1103 (codified at 20 U.S.C.

§ 1400(a)).

The IDEA offers "a simple exchange:" in return for federal funding, states must ensure

that every child with a disability has access to a "'free appropriate public education' (FAPE)."

*T.B., Jr. ex rel. T.B., Sr. v. Prince George's Cnty. Bd. of Educ.*, 897 F.3d 566, 571 (4th Cir. 2018)

(quoting 20 U.S.C. § 1412(a)).   A FAPE refers to "special education and related services;" which

is to say, "instruction" that "meet[s] the unique needs of a child" and "supportive services" so

that the child may benefit from that instruction.   20 U.S.C. §§ 1401(9), 26(A), (29).   Those

services must (1) be without charge, (2) meet the standards of the student's state's educational

agency, (3) include an appropriate level of education in the student's state and (4) conform with

an individualized education program. *Id.*  § 1401(9)(A)–(D).   That final step — the IEP —

serves as the "primary vehicle for ensuring the student receives a FAPE." *K.I. v. Durham Pub.*

*Sch. Bd. of Educ.*, 54 F.4th 779, 785 (4th Cir. 2022).

IEPs "describe[] the child's unique needs and the state's plan for meeting those needs"

and are the "centerpiece of the statute's education delivery system for disabled children." *R.F.*

*ex rel. E.F. v. Cecil Cnty. Pub. Sch.*, 919 F.3d 237, 241 (4th Cir. 2019); *Honig v. Doe*, 484 U.S.

305, 311 (1988).   The IDEA requires IEPs to include (i) "the child's present levels of academic

[] and functional performance," (ii) "measurable annual goals," (iii) a roadmap for "how the

child's progress towards meeting the annual goals . . . will be measured," and (iv) a list of "the

special education and related services and supplementary aids and services . . . that will be

provided to the child." 20 U.S.C. § 1414(d)(1)(A)(i)(I)–(IV).   To satisfy its IDEA obligations, a

public school must offer an IEP that is "reasonably calculated to enable a child to make progress

18

appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017).  Schools formulate IEPs through a consultative process involving teachers, school officials and the student's parents. *Durham Pub. Sch. Bd. of Educ.*, 54 F.4th at 785.

The IDEA also provides several procedural mechanisms to resolve disputes between parents and public schools.  These procedures "guarantee parents both an opportunity for meaningful input . . . and the right to seek review of any decisions they think are inappropriate." *Honig*, 484 U.S. at 311–12.  But "federal courts cannot run local schools." *Hartmann ex rel. Hartmann v. Loudoun Cnty. Bd. of Educ.*, 118 F.3d 996, 1001 (4th Cir. 1997).  For this reason, the IDEA provides several off ramps before judicial intervention becomes necessary.  Parents have an opportunity to "examine all records" relating to their child and "participate in meetings with respect to the identification, evaluation, and education placement of the child."  20 U.S.C. § 1415(b)(1).  They may request an independent education evaluation. *Id.*; 34 C.F.R. § 300.502. If disagreement persists, parents may participate in mediation at the school's expense, 20 U.S.C. §§ 1415(b)(5), (e)(2)(D), or request "an impartial due process hearing" before a neutral hearing officer.  20 U.S.C. §§ 1415(f)(1)(A), (3)(A).  A due process hearing entails the ordinary trappings of civil litigation:  parties have a right to counsel, to introduce evidence and cross-examine witnesses and to a final decision that makes findings of fact and awards appropriate relief. *Id.* § 1415(h).

Only after completion of this process may a dissatisfied party seek judicial review of the "findings and decision" of the hearing officer. *Id.* § 1415(i)(2)(A).  These judicial proceedings are "independent civil actions in which the district court considers the record of the state

administrative hearing, as well as any new evidence offered by a party, and makes findings based on the preponderance of the evidence." *Z.P. ex rel. R.P.*, 399 F.3d at 304.  The burden of proof falls on the party seeking relief.  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

In assessing a hearing officer's decision, district courts apply a modified *de novo* standard of review, under which they make an "independent decision based on the preponderance of the evidence" while "giving 'due weight' to the underlying administrative proceedings." *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 103 (4th Cir. 1991); *R.F. ex rel. E.F. v. Cecil Cnty. Pub. Sch.*, 919 F.3d 237, 244 (4th Cir. 2019) (internal quotations omitted).  Due weight means treating a hearing officer's regularly made findings as "*prima facie* correct, akin to the traditional sense of permitting a result to be based on such fact-finding, but not requiring it." *Doyle*, 953 F.2d at 105.  Factual findings are "regularly made" unless the hearing officer has strayed "so far from the accepted norm of a fact-finding process" that she has effectively "abdicat[ed] her responsibility to decide the case." *Bouabid v. Charlotte-Mecklenburg Schs. Bd. of Educ.*, 62 F.4th 851, 857–58 (4th Cir. 2023).

On the merits, the IDEA sets forth a two-step inquiry for a reviewing court.  First, the court asks if "the State complied with the procedures set forth in the Act." *Rowley*, 458 U.S. at 206.  This includes whether "the State has created an IEP for the child in question which conforms with the [IDEA]." *Id.* at 206 n.27.  Second, the court determines if the IEP offers a FAPE. *Id.* at 207.  This requires the IEP to be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 399.  The IEP need only be "reasonable," not "ideal." *Id.*  But this standard requires schools to provide more than "some educational benefit to a child." *R.F. ex rel. E.F.*, 919 F.3d at 245.  If an IEP proves

deficient, the school district may be ordered to "reimburse the parents for the cost of []
enrollment" at "a private [] school."  20 U.S.C. § 1412(a)(10)(C)(ii).

## III.    ANALYSIS

LCPS advances four independent challenges to the Hearing Officer's Decision.  Before
addressing these objections, an antecedent issue must first be addressed:  the proper standard of
review.

### A.    Standard of Review

LCPS argues that the Hearing Officer's Decision was not regularly made and is thus "due
no deference."  (Plaintiff's Brief in Support of Motion for Judgment on the Record ("Pl. Br.")
(ECF No. 22) at 18.   In its words, the Hearing Officer "completely bungled" the burden of
proof, "fail[ed] to meaningfully analyze factual evidence," and displayed "ignorance of
controlling IDEA legal standards."  (Pl. Br. at 13–14, 17; Plaintiff's Opposition Br. to
Defendant's Motion for Judgment on the Record ("Pl. Opp.") (ECF No. 34) at 4).   In other
words, because the Decision was *so* wrong, it cannot be called regular.  This misses the mark
entirely.  The regularly made inquiry is one of procedure, not substance.  *J.P. ex rel. Peterson v.
Hanover Cnty. Sch. Bd.*, 516 F.3d 254, 259 (4th Cir. 2008); *Bouabid*, 62 F.4th at 857.  Any
purported "deficiencies in the hearing officer's opinion" do not speak to the "process through
which the hearing officer made the required factual findings."  *J.P. ex rel. Peterson*, 516 F.3d at
259–60.

The Hearing Officer considered adversarial briefing, resolved *motions in limine* and held
a four-day hearing during which both parties were free to call and cross-examine witnesses,
introduce evidence and advance their arguments.  (AR1–46, AR71, AR193, AR221, AR231,

21

AR3093–94).  The hearing transcript bespeaks Officer Hartsoe's active participation.  (*See, e.g.*, AR3113–16, AR3126, AR3136–37, AR3790).  The product of this hearing was a sixty-three-page Decision that synthesized over one thousand pages of testimony, reached eighty-six enumerated findings of fact and resolved fourteen issues previously identified by the Hearing Officer.  (AR191–253).  *Cf. J.P. ex rel. Peterson*, 516 F.3d at 262 (twenty-five-page opinion containing only two, "bare-boned" factual findings of disputed issues was still regularly made); *Hogan v. Fairfax Cnty. Sch. Bd.*, 645 F. Supp. 2d 554, 599 (E.D. Va. 2009) (finding a Hearing Officer's finding regularly made where a "proper hearing was held; witnesses from both sides testified and were cross-examined; voluminous exhibits were submitted; and the hearing officer was fully engaged in the process").  Nothing in the record "indicate[s] sloppiness or indifference or the desire of the [Hearing Officer] to simply rush out the door."  *Bouabid*, 62 F.4th at 858.  To the contrary, the Decision meticulously sweeps through the evidence.  The IDEA's procedural safeguards were fully satisfied, as were their state law counterparts.  20 U.S.C. § 1415(h); 8 Va. Admin. Code §§ 20-81-210(K), (O)(14)–(15).

The upshot is this:  the Hearing Officer "conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments," offer "witnesses [] and exhibits," and "raise evidentiary issues."  *J.P. ex rel. Peterson*, 516 F.3d at 259; *Bouabid*, 62 F.4th at 858.  The IDEA requires no more.  Because the Hearing Officer's findings were regularly made, those findings are entitled to due weight.  Thus, to the extent that this Court departs from those findings, it must provide a reasoned basis for doing so.  *Doyle*, 953 F.2d at 105.

### B.     LCPS's Merits Objections

LCPS contends that the Hearing Officer's Decision (i) misallocated the burden of proof; (ii) misjudged competing witness testimony; (iii) misapplied the IDEA's least restrictive environment standard; and (iv) misinterpreted the Supreme Court's *Burlington* test.  (Pl. Br. at 17).  The Court addresses each in turn.

### 1.     The Burden of Proof

The IDEA fails to speak to which party bears the burden of proof in an administrative hearing.  In the face of this legislative silence, the "ordinary default rule" applies, with the burden on "the party seeking relief" in the administrative hearing.  *Schaffer*, 546 U.S. at 57, 62. On this, the parties agree.  (Pl. Br. at 17–18; Defendant's Motion for Judgment on the Record ("Defs.' Br.") (ECF No. 32) at 16–17).  So too did the Hearing Officer, who stated that "the Parent/Child . . . have the burden of proof in this [] hearing," and that "the Parent was required to prove, by a preponderance of the evidence, that the LEA denied the Child FAPE." (AR240, AR242).  He went on to explain that "with the burden of proof, the Parent/Child" successfully established that LCPS failed to comply with the IDEA.  (AR245, AR250).  Notwithstanding that the Decision thrice recited that Defendants bore the burden of proof, LCPS posits that the Hearing Officer shifted the burden to it *sub silentio*.  LCPS's objection fails.

The School Board divines Officer's Hartsoe's secret swivel from his "focus[] [] on LCPS's 'failure to provide persuasive evidence that placement at GPES . . . would provide FAPE to [K.B.].'"  (Pl. Opp. at 4 (quoting AR 236)) (alterations omitted).  But the Hearing Officer's focus on the deficiencies of LCPS's presentation does not warrant the logical leap that he somehow misunderstood the burden of proof.  As another district judge aptly put it, "[a] failure

23

of argument can be asserted without violating burden of proof concepts." *United States v. Cunningham*, 2008 WL 4512169, at *1 (W.D. Mo. Oct. 7, 2008); *accord Castro-Lino v. Haynes*, 2020 WL 5947271, at *8 (W.D. Wash. Sept. 9, 2020), *report and recommendation adopted*, 2020 WL 5946156 (W.D. Wash. Oct. 7, 2020) ("It is not burden-shifting to point out that evidence does not support a [litigant's] argument.")  The Hearing Officer credited the evidence and testimony presented by Defendants.  (AR238, AR241 AR243, AR246).  Because he did so, he explained that the contrary evidence offered by LCPS failed to rebut Defendants' claims.  It is of no occasion that Officer Hartsoe largely focused on why LCPS failed to carry the day.  This Court does not stand to police the intensity with which a Hearing Officer elucidates the strengths of one party over the shortcomings of another.  Because the Hearing Officer did not place the burden of proof on LCPS, the School Board's objection may easily be rejected.

## 2.     The Witness Testimony

LCPS next argues that the Hearing Officer erred by failing to defer to the School Board's witnesses.  This failure, LCPS posits, constitutes "clear legal error" warranting *de novo* review.  (Pl. Br. at 25).  To state this argument is almost to refute it.  The Court finds no reason to question the Hearing Officer's credibility judgments.

The IDEA places "primary responsibility for formulating the education [of a disabled] child . . . [with] state and local educational agencies." *Rowley*, 458 U.S. at 207.  For this reason, courts — and hearing officers — must avoid "substitut[ing] their own notions of sound educational policy for those of the school authorities which they review," *id.* at 206, or "disturb[ing] an IEP simply because [they] disagree with its content." *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 532 (4th Cir. 2002) (quoting *Tice ex rel. Tice v.*

24

*Botetourt Cnty. Sch. Bd.*, 908 F.2d 1200, 1207 (4th Cir. 1990)).  These principles ordinarily justify "great deference to the judgment of education professionals."  *E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 517 (4th Cir. 2014).[11]  But deference must be "based on the application of expertise and the exercise of judgment by school authorities."  *Endrew F.*, 580 U.S. at 404.  And even where appropriate, deference is not "an invitation to abdicate [the] obligation to enforce the statutory provisions that ensure a free and appropriate education."  *Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171, 184 (3d Cir. 1988).  In other words, the School Board's belief that it complied with the law is not some talismanic get-out-of-IDEA free card.

LCPS proffers a variety of arguments as to why its witnesses are more credible than Defendants'.  But the Court does not address this question in an analytic vacuum.  The Hearing Officer heard and saw these witnesses testify and made his own credibility determinations.  Officer Hartsoe acknowledged the deference due to LCPS's expert witnesses; he simply found LCPS's witnesses to be "unpersuasive" and Defendants' "very persuasive."  (AR241–43).  Where a hearing officer provides reasoned consideration of competing testimony, this Court does not scrutinize those findings *de novo* simply because the public school failed to persuade.  To the contrary, weighing conflicting testimony is quintessentially the province of a factfinder.  *Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985); *see Doyle*, 953 F.2d at 104–05 (holding that a district court improperly discounted the conclusion of a hearing officer "who had seen and

---

[11]    *See also Tice*, 908 F.2d at 1207 ("a reviewing court should be reluctant [] to second-guess the judgment of education professionals"); *M.M. ex rel. D.M.*, 303 F.3d at 532 ("We have always been, and we should continue to be, reluctant to second-guess professional educators"); *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 328 (the IDEA "requires great deference to the views of the school system").

heard the same witness testify"); *Lawson*, 354 F.3d at 328 (finding that the district court "wholly disregarded IDEA's mandate" in "its sweeping dismissal of the ALJ's findings" based on a review of the "cold record"). LCPS offers no reason to part from the Hearing Officer's findings in this case.

Officer Hartsoe heard testimony from eleven witnesses — eight for Defendants, of whom six provided expert testimony, and three for the School Board, all of whom qualified as experts. (AR193, AR221).[12]  Those expert witnesses are listed below.[13]

| LCPS | Parents |
|---|---|
| **Katherine Hill (Autism Consulting Teacher)**<br><br>Ms. Hill served as K.B.'s Kindergarten and First Grade teacher and later worked as an autism consulting teacher for GPES following K.B.'s move.  She is a BCBA and Licensed Behavioral Analyst ("LBA") in Virginia.  Her testimony was offered as "an expert in the area of special education programming for students with characteristics of autism." (AR221–25). | **Dr. William Ling (IEE Expert)**<br><br>Dr. Ling is clinical psychologist who performed an IEE and a neuropsychological evaluation of K.B.  He testified as "an expert in the area of clinical psychology," (AR199–202), and not as "an expert in special education. (*Id.* n.2). |
| **Tammy Davis (Special Education Supervisor)**<br><br>Ms. Davis is a special education supervisor for related services.  She overseas approximately 116 service staff members spanning the county's ninety-four schools.  Her testimony was offered as "an expert in speech-language pathology and | **Jacqueline Easton (KTS Behavior Program Specialist)**<br><br>Ms. Easton is special educator, BCBA licensed in Maryland, and employee of KTS who provided in-classroom behavioral support for K.B.  She testified as "an expert in the areas of special education and behavioral analysis." (AR202–04). |

---

[12]      Defendants' two non-expert witnesses were Mr. and Mrs. Bunkua.

[13]      The Decision omits the names of testifying witnesses.  Their identities are purportedly contained in a confidential legend affixed as an appendix to the Decision.  (AR192 n.1).  No such appendix appears in the record.  Because both parties name these witnesses in their public briefs, the witnesses' identities are no longer confidential.  The witness list reproduced herein reflects the Court's best attempt to reconstruct that missing legend, and includes the moniker ascribed to each witness in the Decision.

| | |
|---|---|
| special education programming for students with communication language deficits." (AR226–27). | |
| **Dr. Joy Engstrom (LEA BCBA)**<br><br>Dr. Engstrom is the special education supervisor for LCPS and a BCBA, LBA and special education teacher in Virginia. Her testimony was offered as "an expert witness in special education and educational programming for students with characteristics of autism." (AR227–31). | **Dr. Nicole Abera (KTS Administrator)**<br><br>Dr. Abera is a special educator licensed in Maryland and the director of KTS. She testified as an expert in "special education, school administration and IEP development." (AR204–06). |
| | **Sherry Csutoros (ABA Specialist)**<br><br>Ms. Csutoros is a BCBA behavioral consultant who provided ABA services to K.B. at his home. She worked with the family since 2017. She testified as "an expert in the area of applied behavior analysis." (AR206–210). |
| | **Breana Gretsky (KTS Special Education Teacher)**<br><br>Ms. Gretsky is a special educator licensed in Maryland and K.B.'s teacher at KTS during the 2021–22 school year. She testified as "an expert in special education." (AR210–212). |
| | **Dr. Jay Lucker (Speech Pathologist)**<br><br>Dr. Lucker is an audiologist, speech-language pathologist and a special educator in New York. He testified as an expert "in the area of audiology and speech-language pathology," (AR213–18), and not as an expert in "special education." (*Id.* n. 3). |

LCPS's witnesses each testified that the School Board's proposed IEPs would provide K.B. a FAPE. (AR223–25, AR226–27, AR229). Defendants' witnesses — Dr. Ling, Dr. Lucker and Ms. Csutoros — reached the opposite conclusion. (AR200, AR209, AR214–15). Faced with this competing testimony, LCPS argues that the Hearing Officer should have credited its witnesses' testimony for three reasons: (i) their familiarity with K.B.; (ii) their training and

experience with autistic children; and (iii) the deference ordinarily due to public educators. The Court disagrees.

The Hearing Officer concluded that LCPS's witnesses were "credible" but that their testimony should ultimately be "discounted." (AR225, AR230). Dr. Engstrom lacked "actual interaction with the Child," and when she observed K.B. at KTS, she "appeared to [] 'cherry-pick[]' problems" with their program. (AR230). Her rejection of certain ABA services as necessary to K.B.'s receipt of a FAPE was viewed as a self-serving "attempt to explain the failure of [LCPS] to [provide] IDEA services during" the pandemic. (AR230–31). Ms. Davis never met or "provided services directly to [K.B.]" (AR227). And while Ms. Hill was acquainted with K.B., her testimony was "general, and, when specific, was not based on actual current interaction with [K.B.]" (AR225). Several years had elapsed since Ms. Hill taught K.B. In the interim, K.B.'s mushrooming disabilities had inhibited his ability to progress. But Ms. Hill's testimony was based on her knowledge of a pre-pandemic K.B. Indeed, she justified the adequacy of Goshen Post Elementary School, because it was "a very similar structure to what [K.B.] experienced before . . . the pandemic. It was basically the same structure as before . . . the instruction didn't change." (AR222 (quoting AR3820–21)). That was precisely the problem. As the Hearing Officer explained, what was missing from Ms. Hill's testimony "was a meaningful description of the impact . . . of the virtual services on [K.B.] and his resulting academic needs afterwards." (AR225). Because of the shallow experience of these witnesses with K.B's post-pandemic needs, the Hearing Officer justifiably declined to blindly credit their testimony. *Cf. Oberti ex rel. Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1222 (3d Cir. 1993) (where school officials fail to give an issue adequate consideration, deference is not due).

The Hearing Officer also provided good reasons for finding Defendants' witnesses persuasive.  Dr. Ling brought to bear "professional insights on specific areas [of K.B.'s] needs" and the adequacy of the IEPs to those needs.  (*Id.*)  It was Dr. Ling who "identified, for the first time, the actual and specific needs of [K.B.] to access curriculum."  (*Id.*)  Thus, Dr. Ling was found to be an "unbiased" and "extremely credible witness."  (AR202).  Ms. Csutoros worked with K.B. and his family for years.  (AR206).  She had firsthand experience with how remote learning stymied K.B.'s progress:  the family had experimented with telehealth, but suspended these services until Csutoros could offer in-home support, because computers only aggravated K.B.'s dour state.  (AR207 (quoting AR3480–82)).  Her familiarity with K.B. allowed her to identify deficiencies in IEPs that the School Board otherwise thought adequate.  (AR209).  The Hearing Officer was free to give this testimony "great weight" based on her "years of contact with [K.B.], her experience and educational background, her 'hands-on' knowledge of [K.B.]'s needs and goals, her observations at both KTS and [Little River Elementary School] and her . . . interaction with K.B.'s professionals."  (AR210).  Finally, Dr. Lucker "identified, in detail with examples, [K.B.'s] actual and specific needs" for a productive learning environment, in contrast to the more generic testimony of Defendants' witnesses.  (AR218).  The Hearing Officer appropriately credited this more thorough explanation.

LCPS makes much of the fact that Defendants' witnesses "are not educators" and were not designated as experts in special education.  (Pl. Opp. at 9; Pl. Br. at 25).  But the Court sees no reason why a background in education was necessary to spot the deficiencies in LCPS's IEPs. For example, Dr. Lucker diagnosed K.B. as afflicted with an "incapacity . . . without intervention, to interpret speech."  (AR213).  Yet K.B.'s April IEP contained "no goals for

auditory processing." (AR214 (quoting AR3593)). Similarly, Csutoros's intimate knowledge of

K.B. led her to recognize needs in K.B. antithetical to what the School Board proposed.

(*Compare* AR207 (quoting AR3479) (Csutoros explaining that K.B. needed "to be presented

with [] task[s] multiple times" and "require[d] a high level of reinforcement" to learn) *with*

AR228 (quoting AR3942–44) (Dr. Engstrom suggesting that public school was superior, because

KTS "overprompt[ed]," and this "overprompting [would] lead[] to learned helplessness")).

       None of the Hearing Officer's witness assessments suggest error. The Decision is replete

with credibility determinations and the relative weighing of witness testimony, and it explains in

detail why Officer Hartsoe did not heedlessly defer to the School Board's testimony. A

factfinder's "evaluation of credibility" warrants "great deference." *Hernandez v. New York*, 500

U.S. 352, 364 (1991); *see M.B. v. Fairfax Cnty. Sch. Bd.*, 660 F. Supp. 3d 508, 527 (E.D. Va.

2023) ("Fourth Circuit precedent . . . establishes that . . . district courts must give due regard to

the Hearing Officer's opportunity to hear in-person testimony and assess the weight and

credibility of witnesses"). Indeed, a Hearing Officer "need not 'explain in detail [his] reasons for

accepting the testimony of one witness over that of another'" for his credibility determinations to

command respect. *Bouabid*, 62 F.4th at 859; *see also J.P. ex rel. Peterson*, 516 F.3d at 262

("[O]ur case law does not require an IDEA hearing officer to offer a detailed explanation of his

credibility assessments"); *Z.P. ex rel. R.P.*, 399 F.3d at 306–07 ("credibility determinations

implicit in a hearing officer's decision are as entitled to deference . . . as explicit findings.") The

Decision far exceeds this standard. LCPS radically misreads the record and the law of this

Circuit in ascribing "clear legal error" to the Hearing Officer's well-supported conclusions.

### 3.      The Least Restrictive Environment

LCPS further argues that the Hearing Officer misapplied the IDEA's least restrictive environment ("LRE") requirement.  LCPS ascribes three errors to the Hearing Officer's LRE conclusion:  the Decision (i) incorrectly placed the burden of proof on the School Board; (ii) violated the IDEA's presumption of mainstreaming disabled students into the general education setting; and (iii) disregarded evidence showing that K.B.'s needs could be met in the public school setting.  The first purported error can be readily disposed of; it is no more than a rehash of LCPS's earlier burden shifting arguments that the Court has considered and rejected *supra* § III.B.1.  The latter two claims warrant further discussion.

The IDEA requires schools to place disabled students in the "least restrictive environment appropriate for the child's education."  *R.F. ex rel. E.F.*, 919 F.3d at 247.  A child's LRE must allow her to be "educated with children who are not disabled" to "the maximum extent appropriate."  20 U.S.C. § 1412(a)(5)(A).  This language "'indicates a strong congressional preference for mainstreaming' students in the general education classroom," yet recognizes that "mainstreaming is not appropriate for every child with a disability."  *R.F. ex rel. E.F.*, 919 F.3d at 246 (cleaned up) (quoting *DeVries ex rel. DeBlaay v. Fairfax Cnty. Sch. Bd.*, 882 F.2d 876, 878 (4th Cir. 1989)).  In other words, the statute sets a presumptive default for integrating disabled students into general education, which may be overcome "when the nature or severity of the disability . . . is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."  20 U.S.C. § 1412(a)(5)(A).  This latter standard is met where "(1) the disabled child would not receive an educational benefit from mainstreaming into a regular class; (2) any marginal benefit from mainstreaming would be significantly

outweighed by benefits which could feasibly be obtained only in a separate instructional setting; or, (3) the disabled child is a disruptive force in a regular classroom setting." *Hartmann ex rel. Hartmann v. Loudoun Cnty. Bd. of Educ.*, 118 F.3d 996, 1001 (4th Cir. 1997).

Officer Hartsoe determined that "KTS, without its access to general education students" remains K.B.'s LRE, considering "the Child's severe IDEA needs, negative reaction to bus transportation, and his diagnosis, testimony from Parent/Child's experts and current circumstances." (AR245). Although the Decision offers scant detail, the gravamen of the Hearing Officer conclusion was that K.B.'s disabilities precluded education alongside non-disabled peers. (*See* AR234 ¶¶ 61–63, AR237 ¶¶ 78, 83, AR249). That conclusion finds support in the record. Dr. Ling testified that, based on his experience working with children suffering comparable developmental difficulties, K.B. required a *sui generis* learning environment that could only be found at two schools, KTS and another private facility. (AR200 (quoting AR3218–20)). Dr. Ling explained that K.B. required "persistent application of sensory processing strategies" to complete any prolonged task and, in turn, learn. (AR201 (quoting AR3237–38)). Ms. Csutoros highlighted that K.B. "requires a more intensive level of instruction," because he "does not learn naturally" and "does not learn in a novel environment." (AR207 (quoting AR3480)). She explained that while the ordinary child receiving ABA services can still "go out into the natural environment," K.B.'s "severe" needs precluded this. (*Id.* (quoting AR3483)).

Ms. Easton also explained why K.B. would prove disruptive in the regular classroom setting. When K.B. became frustrated, he would "push[] staff, attempt[] to elope out of the building, attempt[] to pull fire alarms, push[] over furniture, [and] rip[] up materials." (AR203

(quoting AR3270)).  Csutoros similarly testified that K.B. would have "tantrums" that could last "up to 45 minutes to an hour" and would prove highly disruptive in a general education setting. (AR208 (quoting AR3495–96)).  The Hearing Officer's factual findings credit these witnesses' testimony.  (AR233–37 ¶¶ 22, 24, 26, 33, 34, 38–39, 56, 61–63, 70–72, 78–83).  And these findings satisfy at least the second and third *Hartmann* elements.

LCPS highlights the Hearing Officer's failure to acknowledge and distinguish its contrary expert testimony.  (Pl. Br. at 27 (citing AR3953)).  But an adjudicator "can consider all the evidence without directly addressing in his written decision every piece of evidence," and "the fact that the [] opinion failed to discuss all of the testimony and evidence presented to him does not mean that the [Hearing Officer] 'failed to consider' the evidence." *Loral Def. Sys.-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999) (quoting *NLRB v. Beverly Enter.-Mass.*, 174 F.3d 13, 26 (1st Cir. 1999)); *see Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (holding the same).  This is particularly true in IDEA cases.  A hearing officer is allotted only forty-five days from a hearing to issue a decision.  8 Va. Admin. Code § 20-81-210 (Q)(6).  As the Fourth Circuit has cautioned, "this short time-frame means that . . . hearing officers (who have no state-provided law clerks or clerical support) cannot be expected to craft opinions with the level of detail and analysis [] expect[ed] from a district judge." *J.P. ex rel. Peterson*, 516 F.3d at 263.

The IDEA does not inexorably command placement with non-disabled peers.  The loadstar of the LRE analysis is the "*environment appropriate for the child's education*."  *R.F. ex rel. E.F.*, 919 F.3d at 247.  For some disabled students, this will require "a structured program" unavailable in the general education setting.  *Id.* (quoting *DeVries*, 882 F.3d at 879).  The

33

Hearing Officer determined that K.B. is such a student.  The Court acknowledges the sparse

detail offered by the Hearing Officer on his LRE determination.  But LCPS offers no persuasive

reason to discredit Officer Hartsoe's weighing of the evidence, and thus no reason to reject his

findings that K.B. required KTS's more restrictive environment to receive a FAPE.

### 4.        The *Burlington* Test

Finally, LCPS argues that the Hearing Officer misapplied the Supreme Court's

*Burlington* test for private placement.  This last theory of error fares no better.

When a school district cannot provide a FAPE to a disabled child, the IDEA requires that

the public assume the cost of placing the child in a private school that can meet that child's

needs.  20 U.S.C. § 1412(a)(10)(B)–(C)(ii); 34 C.F.R. § 300.148(c).  To impose this liability on a

school district, parents must demonstrate that (1) the "public school fail[ed] to prove a FAPE"

and (2) the private school is "appropriate" for the child.  *Forest Grove Sch. Dist. v. T.A.*, 557

U.S. 230, 232 (2009) (distilling *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S.

359, 369–70 (1985)).  Parents must satisfy this first element before consideration of the second.

*Carter ex rel. Carter v. Florence Cnty. Sch. Dist. Four*, 950 F.2d 156, 161 (4th Cir. 1991).

LCPS argues that the Hearing Officer inverted *Burlington* by focusing on K.B.'s progress

at KTS rather than the adequacy of LCPS's IEPs.  This last claim encapsulates all of LCPS's

prior objections:  LCPS asserts that the Hearing Officer (i) required it to disprove that KTS

offered a FAPE rather than requiring Defendants to prove that LCPS failed to offer a FAPE;

(ii) incorrectly relied on expert witnesses unfamiliar with LCPS's school program; and

(iii) offered only a conclusory analysis that failed to grapple with the record evidence.  The Court

addresses each in turn.

34

### a.     The Focus on KTS and LCPS's Failures of Proof

LCPS highlights that the Hearing Officer's factual findings state that "'the LEA failed to provide persuasive evidence that placement at GPES . . . would provide FAPE to the Child' and that no 'persuasive evidence was introduced [showing] that [] KTS did not provide FAPE to the Child." (Pl. Br. at 19 (quoting AR236–37 ¶¶ 68, 77)).  From this language, LCPS once again posits that the Hearing Officer placed the burden of proof on it.  That claim carries no more persuasive force than LCPS's prior invocation of the same argument.  As explained *supra* § III.B.1, the recitation of LCPS's failure to persuade does not indicate that the Hearing Officer erroneously believed that LCPS was required to prove the adequacy of its IEPs or the inadequacy of KTS.  Rather, the Hearing Officer identified specific deficiencies in LCPS's IEPs that denied K.B. a FAPE.  (AR 232–37 ¶¶ 1–5, 7, 15–16, 19–20, 22–24, 26, 32, 35–36, 41, 45–48, 51, 72). LCPS's contrary evidence was found unpersuasive.  (AR234–37 ¶¶ 32, 54, 68, 73–76, 79–81). Defendants' evidence demonstrated that K.B. was receiving a FAPE at KTS, and LCPS failed to dissuade the Hearing Officer of that conclusion.  (AR234–37 ¶¶ 34, 37, 39, 52–53, 56, 60–63, 77–78, 82–83).  There was no misapplication of burdens by the Hearing Officer, nor does his Decision devote a disproportionate share of its analysis to the second *Burlington* element.  Of the eighty-six findings of fact made by the Hearing Officer, fifty-five relate in some form to LCPS's IEPs while only nineteen relate to KTS.  (*Compare* (AR232–37 ¶¶ 1–32, 35–36, 40–48, 51, 62, 68–74, 83, 85–86) *with* (AR234 ¶¶ 33–34, 37–39, 52–61, 63, 77–78, 82)).

### b.     Witness Knowledge of LCPS's Program

The Hearing Officer did not err in crediting Defendants' witnesses to reach those findings.  LCPS relies on *L.C. v. Arlington Cnty. Sch. Bd.* for the proposition that a hearing

officer must defer to a school board's expert witnesses who possess direct knowledge of the school's public program. 2022 WL 2293902 (E.D. Va. June 24, 2022). That case fails to persuade.

In *Arlington Cnty.*, the parents of a disabled student withdrew their child, L.C., from public school and enrolled him at a private institute, Lab School. *Id.* at *2–3. The parents later filed a due process complaint seeking tuition reimbursement. *Id.* at *5. At the hearing, a private education consultant and two educators from Lab School testified on the parents' behalf. *Id.* at *9. The consultant "observed the [school district's] proposed programs for L.C." and concluded that the school district "did not fully implement L.C.'s proposed IEP" or offer the support services that L.C. required. *Id.* at *4. The school district's witnesses disputed this characterization, but by the time of the hearing, they had not taught L.C. for more than two years. *Id.* at *5. Nevertheless, the hearing officer gave greater weight to the public school's witnesses based on their direct experience working with L.C. *Id.* at *10. The district court affirmed that decision. *Id.*

From *Arlington Cnty.*, LCPS derives the mistaken proposition that a hearing officer must defer to "professional educators" who can "speak to the student's progress within the public school setting." (Pl. Br. at 22). And because the parents' witnesses in *Arlington Cnty.* "actually observed the proposed public program" — while Defendants' witnesses here "[n]ever observed LCPS'[s] proposed program or had 'direct experience' working with [K.B.] in an educational setting" — LCPS posits that the Hearing Officer committed "legal error" reviewable "*de novo*." (*Id.*)

That radically misreads *Arlington Cnty.* Two of the parents' three witnesses in that case

36

lacked "direct experience with L.C. as a student." *Arlington Cnty.*, 2022 WL 2293902, at *9. The third witness — the parents' consultant — examined the public school "more than a year after [L.C.] had left" and "observ[ed] other special education students . . . [who] all had different IEPs from that proposed [] for [L.C.]." *Id.* The consultant never spoke with the relevant specialists or teachers, and "never evaluated LC or spoke with him." *Id.* The hearing officer sensibly gave this testimony little weight. By contrast, the school district's witnesses were "able to observe [L.C.]," testified "knowledgeably about L.C.'s progress," demonstrated "in-depth knowledge of [L.C.] and his educational needs," and were overall "more familiar[] with L.C." *Id.* (internal alterations omitted). This was so despite the lapse in time since L.C.'s disenrollment from public school; L.C.'s post-transfer evaluations were "[c]onsistent with previous evaluations" from his time in public school, and thus the school district witnesses' seeming distance from L.C. was only superficial. *Id.* at *4.

Precisely the opposite stands true here. Defendants' witnesses were all familiar with K.B. One of them, Ms. Csutoros, had years of experience working with K.B. And while Defendants' witnesses may not have observed K.B. at LCPS, such observations were unnecessary to identify the deficiencies in LCPS's IEPs. Certain IEPs lacked any goals directed to K.B.'s disabilities; others posited intervention strategies that contravened K.B.'s needs. *See* discussion *supra* § III.B.2. Only one of the School Board's witnesses, Ms. Hill, had any familiarity with teaching K.B. And that tether to K.B. had soured. Unlike the student in *Arlington Cnty.* — whose needs remained essentially static — K.B. underwent a radical transformation in the time since Ms. Hill had last instructed him. Because Ms. Hill had no contemporaneous experience addressing K.B.'s post-COVID inquietude, the Hearing Officer

properly discounted her testimony. *Id.* Indeed, *Arlington Cnty.* betrays the meritless nature of the School Board's objection. The crux of the court's reasoning was the deference due to a hearing officer's weighing of testimony — the anthesis of the result that LCPS seeks here. 2022 WL 2293902, at *9–10.

Seeking to avoid this conclusion, LCPS resorts to pure policy. It warns that if Defendants' witnesses are credited here, then all parents will simply withdraw their students from public school, run the clock and then assert that school officials no longer possess current knowledge of their child. LCPS cautions that "public school divisions would [be left] virtually . . . defen[seless]." (Pl. Br. at 24). As a threshold matter, the Court rejects the premise of LCPS's argument. A hearing officer should give nothing less than his best weighing of the evidence. He does not get to place a thumb on the scale against a party in this case because of worries about future litigants in another case; after all, *the* central inquiry under the IDEA is the individualized circumstances of a child. *Endrew F.*, 580 U.S. at 391. But on the merits, the Court remains unconvinced that LCPS's parade of horribles will come to pass. LCPS's own case shows why this is so. In *Arlington Cnty.*, the testimony of the public school's witnesses was given great weight even though the student had withdrawn from public school more than two years earlier. Ordinarily, as in *Arlington Cnty.*, a school official's knowledge of a child will not expire simply because that child moves from public to private school. In this case, however, K.B. underwent a rapid deterioration during his pandemic-era isolation. School officials' prior knowledge of K.B. was therefore uniquely stale by the time of the due processing hearing, and the Hearing Officer appropriately considered that reality in his weighing of the testimony. LCPS's policy argument thus fare no better than its other critiques of the Hearing Officer's

38

credibility determinations.

### c.      The Sufficiency of the Hearing Officer's Analysis

Finally, LCPS protests the Hearing Officer's purportedly conclusory results.  While the

Court has more sympathy for this critique, LCPS ultimately misses the mark by failing to read

the Decision as a whole.

First, to state the obvious up front:  the Decision's section titled "legal conclusions" — in

which the Hearing Officer resolves each of the fourteen questions raised at the outset of the

proceedings — provides only a terse analysis.  In response to the first question that the Hearing

Officer identified, *i.e.*, "whether the LEA failed to identify the Child's Special Education Needs

in Accordance with [the] IDEA for School Year 2020–21," the Decision explains that:

> [T]he overwhelming evidence is that the LEA failed to identify the Child's IDEA needs
> to generate a viable IDEA regarding all IEPs referenced herein.  With the burden of
> proof, the Parent/Child established[, based on] the opinions and recommendations from
> multiple Parent/Child experts[,] that the LEA failed to recognize, utilize and/or
> implement necessary IDEA requirements to allow the Child to receive FAPE . . . To be
> clear, the experts from the Parent/Child provided credible and very persuasive evidence
> to allow this conclusion.  In contrast, the LEA appeared to be focused on issues outside of
> the Child's IDEA requirements as opposed to effectuating his IDEA needs . . . a
> consequence of the COVID reality.

(AR245–46).  This explanation repeats, with slight variation, across the fourteen issues.  In a

sixty-three-page Decision, these conclusions span only six pages, and within those six pages, the

just-quoted paragraph offers the only substantive analysis.

But brevity alone does not signal a perfunctory analysis.  The Decision devotes dozens of

pages to summarizing witness testimony and exhibits.  (AR193–231).  The Hearing Officer then

provided a thorough list of findings of fact summarizing his evidentiary takeaways.  (AR232–

37).  Within those summations lay the evidence for why LCPS's IEPs failed to provide K.B. a

FAPE and why KTS's program did so.  True, the Hearing Officer offered only a sparse account of how he thought all of the pieces of the evidentiary puzzle fit together.  But that does not mean that the Hearing Officer "abdicated his responsibility" or engaged in only "generic, boilerplate reasoning."  (Pl. Br. at 13).  Rather, the Decision in effect points back to its earlier findings and incorporates them as explanations for its conclusions.

That the Decision repeats its analysis in largely "cut-and-paste[]" fashion is immaterial.  (*Id.*).  Repetition alone does not evince a failure to grapple with the issues; rather, it indicates that the same theme cuts across issues.  A hearing officer need not retread old ground when the problems with one IEP carry forth to another.  *Cf. Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) (an adjudicator need not rehash her analysis after explaining her reasoning elsewhere in the opinion, even if that reasoning does not appear in her conclusions); *M.N. ex rel. Norman v. Sch. Bd. of Va. Beach*, 2018 WL 717005, at *7 (E.D. Va. Feb. 5, 2018) ("a hearing officer cannot fail to consider each year's IEPs, but a hearing officer may criticize all of them with the same violations"); *Ashely M. v. Comm'r of Soc. Sec.*, 2021 WL 1534728, at *7 (W.D.N.Y. Apr. 19, 2021) ("Although the ALJ has an obligation to . . . explain her reasoning, there is no requirement to restate the same reasoning repeatedly when it applies equally to more than one [issue]").

Reading the Decision as a whole, LCPS's IEPs fall into two buckets.  The first — comprising the School Board's IEPs for roughly the 2020–2021 academic year — did not satisfy the IDEA, because they failed to provide K.B. with necessary at home support.  The second — comprising LCPS's IEPs after K.B. enrolled at KTS — did not satisfy the IDEA, because they failed to offer a plan that would allow K.B. to reasonably advance.

i.       LCPS's 2020–2021 IEPs

The record reflects that K.B. could not learn virtually.  During the summer of 2020 and 2020–21 school year, K.B. not only failed to progress; he actively regressed.  K.B.'s IEPs for this time were anachronistic and ill-adapted to his severe deterioration.  Intervention strategies that may have worked for K.B. pre-pandemic and in-person were no longer sufficient to ameliorate his decline.  As the Hearing Officer found — and witness testimony corroborated — K.B. "could not access [his] curriculum" virtually "[d]ue to his disability."  (AR232 ¶¶ 1–2, 8, 13).  As should be plainly obvious, if a school implements a teaching method that a student cannot access, then that school has denied a FAPE.  (*Id.* ¶¶ 3–4).

None of LCPS's contrary arguments carry persuasive force.  The School Board notes that Defendants "refused to return K.B. to in-person instruction."  (Pl. Opp. at 8).  But LCPS cannot fault Defendants for choosing a learning model that LCPS itself offered (and initially mandated) to all students within the school district.  And LCPS's offer for in-person learning was no more than a magician's choice; that is, the offer for non-distance learning was largely illusory.  LCPS had no in-person instruction until October 13, 2020, and even then, students were learning virtually for most of the week.  (AR1060, AR2316).  By December 2020, all students reverted to fully remote instruction due to a spike in COVID-19 transmission.  (*Id.*).  It was not until February 16, 2021, that LCPS offered consistent in-person instruction.  (AR1060).  And this model still required virtual instruction one day per week.  (*Id.*)[14]  Thus, from at least August 2020 to February 2021, virtual learning was the only choice practically available to Defendants.

---

[14]       The parties have not indicated when a fully non-virtual experience became regularly available.

Moreover, Defendant's selection of fully virtual services was a necessity at the time of their decision.  (AR232 ¶ 6).  It is important to recall Defendants' position in July 2020, when LCPS asked them to choose between fully virtual or hybrid learning.  K.B.'s disabilities precluded him from wearing a mask.  (*Id.* ¶ 9).  He faced a serious risk of COVID infection in the public school setting, and it was unclear if K.B. would be able to ingest medication if he became infected.  (*Id.* ¶¶ 10–11).  Ultimately, the FDA would not grant emergency authorization for minor children to receive their first dose of a COVID-19 vaccine until late October 2021.[15] Defendants were not required (when LCPS eventually offered the choice) to subject their child to a novel disease without protection as a condition of LCPS's provision of a FAPE.

Because in-person instruction was either unavailable or inaccessible safely, and because K.B.'s disabilities precluded him from learning virtually, LCPS was obliged to offer some other method of instruction to satisfy its IDEA obligations.  LCPS possessed sufficient data to discern that one-on-one at home services were necessary for K.B. "to make progress appropriate in light of [his] circumstances."  *Endrew F.*, 580 U.S. at 399; (*see* AR232 ¶¶ 14–16).  Yet LCPS repeatedly refused to provide such services and, in turn, denied K.B. a FAPE.  (AR232–36 ¶¶ 4– 5, 7, 16, 23, 28, 69; *see, e.g.*, AR919 (LCPS's June 2021 IEP noting that LCPS "considered" an at home accommodation but "refused it")).[16]

---

[15]     *See* FDA News Release, *FDA Authorizes Pfizer-BioNTech COVID-19 Vaccine for Emergency Use in Children 5 through 11 Years of Age* (Oct. 29, 2021), https://www.fda.gov/news-events/press-announcements/fda-authorizes-pfizer-biontech-covid-19-vaccine-emergency-use-children-5-through-11-years-age/.  The Court may appropriately take judicial notice "of information contained on . . . government websites." *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) (collecting cases).

[16]     LCPS confusingly argues for the first time in its final brief that the adequacy of its IEPs for 2020–2021 is "irrelevant," because Defendants seek tuition reimbursement "beginning in the

### ii.      LCPS's IEPs post-August 2021

Following K.B.'s private placement, LCPS's IEPs remained deficient, because they never captured K.B.'s learning needs.  Due to K.B.'s regression during the pandemic — and LCPS's refusal to conduct necessary evaluations of K.B. — Defendants sought and obtained Independent Education Evaluations, which were incorporated into the Hearing Officer's findings of fact. (AR233–36 ¶¶ 17–18, 20, 27, 50, 64).  Those IEEs revealed previously undiagnosed conditions in K.B. that "required [] special attention beyond the scope of all IEPs."  (*Id.* ¶ 24).

For example, Dr. Ling diagnosed K.B. with a sensory processing disorder that inhibited his ability to process verbal information and "significantly interfered in [K.B.]'s ability to improve in his academic functioning."  (AR1370).  Yet LCPS offered no ameliorative solutions. K.B.'s April 2022 IEP contained zero "goals or interventions . . . to address the[se] sensory processing issues" and no "interventions . . . to address [K.B.'s] . . . auditory and language processing issues."  (AR200 (quoting AR3226–27)).  The IEP also failed to "incorporate[e] [] ABA-based therapy and interventions," which the Hearing Officer found was necessary for K.B. in the academic setting.  (*Id.*, AR233 ¶ 26).

Dr. Lucker similarly noted that the April 2022 IEP contained "no goals for auditory processing."  (AR214 (quoting AR3593)).  The June 2022 IEP offered "nothing for [K.B.'s] receptive understanding" despite K.B. demonstrating an acute problem with "his receptive

---

2021–2022 school year."  (Pl. Opp. at 8).  But LCPS's own Complaint asks this Court to "[f]ind that the School Board's proposed IEPs during the 2020–2021 . . . school year[] provide Student with FAPE . . . in compliance with the IDEA," and LCPS devotes a substantial portion of its briefing to defending the 2020–2021 IEPs.  (ECF No. 1 ("LCPS Compl.") at 36 ¶ (f)).  In any event, LCPS's noncompliance with the IDEA during this school year goes to the propriety of Defendants' private evaluations, for which the Hearing Officer ordered LCPS to reimburse Defendants.  (AR251–52).

vocabulary." (*Id.* (quoting AR3598–99)). The IEPs went well "beyond where [K.B.] was at" by proposing to teach K.B. to answer questions without offering "any way to identify that he underst[ood]" what the question was asking. (AR214–15 (quoting AR3593, AR3604–05)). Dr. Lucker identified multiple "speech-language and indirect service accommodations" that "were inadequate" for K.B.'s needs. (AR216). The Hearing Officer concluded that Dr. Ling and Lucker possessed "extremely credible . . . professional insights on the specific areas regarding [K.B.'s] needs," and that LCPS failed to offer persuasive evidence to discredit these experts or their findings. (AR202, AR218, AR237 ¶¶ 75–76).

To be sure, the Decision does not go IEP by IEP and explain in detail why each proposal failed to provide K.B. a FAPE. But nothing in the IDEA requires such an exhaustive analysis. That is particularly true here, where some IEPs were merely a palimpsest of LCPS's earlier proposals. (*See* AR214 (quoting AR3603) (explaining that multiple goals in the August 2022 IEP were identical to previous IEPs)). The expert testimony offered a meticulous accounting of why LCPS's IEPs failed to provide even a reasonable opportunity for K.B. to meaningfully progress at LCPS. The Hearing Officer credited that testimony, made derivative factual findings and concluded that LCPS failed to offer a FAPE based on the testimony and exhibits that he observed. The IDEA requires no more. While LCPS may quibble with the meticulousness of the Hearing Officer's analysis, the record provides ample evidence to support his regularly made findings.

### C.      The Scope of Remedial Relief

After finding for Defendants, the Hearing Officer awarded two forms of relief: (1) "[r]eimbursement for enrollment at KTS" and (2) "[r]eimbursement for all private

evaluations:  Neuropsychological Report and Speech/Audio Evaluations."  (AR251–52).

Because this is an independent civil action, the Court is not "limited to the parameters of the

remedies issued by the [hearing officer]."  *Kirkpatrick*, 216 F.3d at 384; *see* 20 U.S.C.

§ 1415(i)(2)(C)(iii) (directing courts to "grant such relief as the court determines [] appropriate")

Exercising its independent judgment, the Court concludes that Defendants remain entitled to the

relief awarded by the Hearing Officer and that LCPS should revise K.B.'s IEP to reflect that

K.B.'s least restrictive environment was and remains KTS for the 2021–24 school years.[17]

## IV.    CONCLUSION

The Court has conducted a thorough review of the record and — in its "independent"

judgment, with "due weight" given to the Hearing Officer's findings of fact — concluded that

LCPS failed to provide K.B. a FAPE from August 2020–2022.  *Bouabid*, 62 F.4th at 857.

LCPS's pre-August 2021 IEPs were not "reasonably calculated to enable [K.B.] to make

progress," because they denied one-on-one at home support, which was a necessity "in light of

[K.B.'s] circumstances."  *Endrew F.*, 580 U.S. at 399.  LCPS's post-August 2021 IEPs failed to

enable K.B. to make reasonable progress, because they failed to address the learning disabilities

identified in K.B.'s private evaluations.

The Decision correctly allocated the burden of proof to Defendants; they simply met that

---

[17]      In its Complaint, LCPS challenges the Hearing Officer's award for its "lack of clear and understandable [] relief" and failure to "clearly define what expenses must be reimbursed." (LCPS Compl. ¶ 123).  But LCPS fails to pursue this issue in its briefs; it asks only that the Court "reverse the Decision of the Hearing Officer."  (Pl. Br. at 28).  LCPS "know[s] what is best for [it]," and determined that its litigation interests were best served contesting liability rather than remedies.  *Greenlaw v. United States*, 554 U.S. 237, 243–44 (2008) (describing the party presentation principle).  The Court holds LCPS to that choice and declines to *sua sponte* raise the issue here.

burden. Defendants did so, in part, based on the testimony of their expert witnesses, whom the

Hearing Officer, as finder of fact, was free to credit over the competing witnesses of LCPS. The

factual findings of the Hearing Officer confirm that K.B.'s least restrictive environment requires

complete separation from the general education setting. And those findings demonstrate both

that LCPS failed to provide a FAPE and that KTS was an appropriate school for K.B.

*Burlington*, 471 U.S. at 369–70. LCPS correctly highlights that the Hearing Officer's Decision

is at time reticent in its explanation. But the Court remains cognizant of the Fourth Circuit's

admonition that hearing officers "cannot be expected to craft opinions with the level of detail and

analysis [] expect[ed] from a district judge." *J.P. ex rel. Peterson*, 516 F.3d at 263. The

Decision is neither unreasoned nor unsupported. It simply reflects the "short time-frame" and

limited support afforded to hearing officers. *Id.* And the deficiencies that LCPS emphasizes

become either irrelevant or illusory when reading the record as a whole.

       Because Defendants have carried their burden, the Court will DENY LCPS's Motion for

judgment on the record (ECF No. 21) and GRANT Defendants' Motion for judgment on the

record (ECF No. 31).

       An appropriate Order will issue.

       Let the Clerk file a copy of this Memorandum Opinion electronically and notify all

counsel of record.

                                   _____/s/_____

                                   David J. Novak

                                 United States District Judge

Alexandria, Virginia
Date: <u>May 20, 2024</u>

## V.       APPENDIX

- Applied Behavior Analysis ("ABA")

- ABA Verbal Therapy ("ABA/VB")

- Autism Spectrum Disorder ("ASD")

- Behavior Intervention Plan ("BIP")

- Board Certified Behavior Analyst ("BCBA")

- Community Independence Instruction ("CII")

- Diagnostic and Preventive Goals ("DPG")

- Developmental Reading Assessment ("DRA")

- Early Childhood Special Education ("ECSE")

- Extended School Year ("ESY")

- Free and Appropriate Public Education ("FAPE")

- Functional Behavioral Assessment ("FBA")

- Goshen Post Elementary School ("GPES")

- Independent Education Evaluation ("IEE")

- Individualized Education Program ("IEP")

- Individuals with Disabilities Act ("IDEA")

- Katherine Thomas School ("KTS")

- Least Restrictive Environment ("LRE")

- Licensed Behavioral Analyst ("LBA")

- Little River Elementary School ("LRES")

- Local Education Agency ("LEA")

47

- Measures of Academic Performance ("MAP")

- Other Health Impairment ("OHI")

- Phonological Awareness Literacy Screening ("PALS")

- Prior Written Notice ("PWN")

- Registered Behavioral Technicians ("RBT")

- Special Education and Related Services ("SPED")

- Specific Learning Disability ("SLD")

- Speech-Language Impairment ("SLI")

- Speech-Language Pathology ("SLP")

- Virginia Department of Education ("VDOE")